**Jeffrey E. FELCE, Plaintiff–Appellant,**

v.

**Patrick FIEDLER, Earl Brunk, also known as Andy Brunk, David H. Dhein, and James L. Schansberg, Defendants–Appellees.**

No. 91–3488.

United States Court of Appeals, Seventh Circuit.

Argued April 14, 1992.
Decided Sept. 15, 1992.

Robert A. Ferg (argued), Sinclair & Ferg, Chippewa Falls, Wis., for plaintiff-appellant.

Eileen W. Pray (argued), Office of the Atty. Gen., Wisconsin Dept. of Justice, JoAnne F. Kloppenburg, Wis. Dept. of Justice, Environmental Protection Unit, Madison, Wis., for defendants-appellees.

Before RIPPLE and MANION, Circuit Judges, and WILL, Senior District Judge.*

RIPPLE, Circuit Judge.

Jeffrey Felce is on mandatory release parole from the Wisconsin prison system after serving six and one-half years of a ten-year sentence for reckless injury. As a condition of his parole, Mr. Felce has been required to have monthly injections of Prolixin, an antipsychotic drug. The defendants are Wisconsin prison officials who allegedly participated in the decision to so

---

* The Honorable Hubert L. Will, Senior United States District Judge for the Northern District of Illinois, is sitting by designation.

condition Mr. Felce's parole. Mr. Felce brought suit against the defendants under 42 U.S.C. § 1983 for violating his rights under the Due Process Clause of the Fourteenth Amendment. The district court found that Mr. Felce had no liberty interest in parole without such a condition and granted the defendants' motion for summary judgment. For the following reasons, we reverse and remand the case to the district court.

## I

## BACKGROUND

### A. *Facts*

The material facts are not in dispute and are summarized by the district court in its Memorandum and Order of September 27, 1991. On May 31, 1984, Jeffrey Felce pleaded guilty to "causing great bodily harm to another human being by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life." This charge arose from Mr. Felce's physical attack upon his ex-wife. On June 4 and 5, 1984, a jury trial was held to determine whether Mr. Felce was suffering from a "mental disease or defect" at the time he committed the crime. The jury found that Mr. Felce suffered from a mental disease or defect, but that he did not lack the capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. On June 25, 1984, Mr. Felce was sentenced to ten years imprisonment.

Upon entering the Dodge Correctional Institution, Mr. Felce was examined by a psychiatrist, Dr. Musunuru, who noted that Mr. Felce had a history suggestive of paranoid psychosis and had been treated in the past with Haldol and Cogentin. According to Dr. Musunuru, "Felce's behavior seemed to improve" when he was on Haldol. Dr. Musunuru recommended that Mr. Felce be administered such an antipsychotic drug, and Mr. Felce agreed. A few months later, however, in the fall of 1984, Mr. Felce was transferred from the Dodge Correctional Institution to Waupun Correctional Center. Mr. Felce asked his new psychiatrist, Dr.

Gale, to discontinue the medication. Dr. Gale discontinued the medication and reported that Mr. Felce had said to him, "Ever since I left Dodge I have vowed never to take any more pills." R. 43 Ex. 111. In July 1987, a social worker named Thomas Sheppard reported that Mr. Felce was angry and had said to him, "When I get out of here, I will blow you away with a .22 or a shotgun." R. 43 Ex. 110. Sheppard recommended: "Begin commitment proceedings under section 51.20 in order to force Felce to take the psychotropic medications which helped him in the past and seem to be necessary for him now." *Id.* In November 1989, Mr. Felce was transferred to the Wisconsin Resource Center where he was evaluated for possible commitment. The Wisconsin Resource Center determined that Mr. Felce did not meet the standards for commitment.

Mr. Felce was scheduled for release on mandatory parole, because he had served two-thirds of his sentence. However, his parole officers and social workers were nervous because of Mr. Felce's threats, so they scheduled him for an additional psychiatric evaluation on January 4, 1990. Mr. Felce refused to leave his cell for the evaluation. Mr. Felce's parole officer, Becky Mladnick, scheduled Mr. Felce for an examination by another psychiatrist, Dr. M.S. Taman, to determine whether Mr. Felce would benefit from antipsychotic drug therapy. On February 8, 1990, Dr. Taman, who had briefly treated Mr. Felce in 1975, examined him again. In 1975, according to Dr. Taman, Mr. Felce had responded positively to antipsychotic drug therapy. Based upon this history and current paranoid behavior, Dr. Taman recommended that Mr. Felce be treated with Haldol Decanoate on a trial basis.

On March 1, 1990, prison officials held a hearing on whether Mr. Felce's refusal to leave his cell on January 4, 1990, coupled with Mr. Felce's "failing to make any effort to accept the opportunities and counseling offered," was sufficient grounds for revocation of Mr. Felce's parole. They determined that this was sufficient, and Mr. Felce's parole was revoked. The parole

board indicated by a memo dated June 1, 1990, that it thought Mr. Felce's release "would involve an unreasonable risk to the public." At or around this date, James Schansberg became the parole agent responsible for planning Mr. Felce's ultimate parole. Recognizing that this was a serious case, Agent Schansberg asked his supervisor, David Dhein, to help him develop the parole plan. Agent Schansberg also called and exchanged correspondence with Dr. Taman, who reiterated his recommendation that Mr. Felce be treated with Haldol. Agent Schansberg and Mr. Dhein also consulted with their regional chief, Earl "Andy" Brunk. On October 5, 1990, Agent Schansberg and Mr. Dhein drew up the parole plan to include the condition that Mr. Felce be under the care of Dr. Taman and receive monthly injections of "medication prescribed by Dr. Taman." On October 22, 1990, Agent Schansberg met with Mr. Felce to go over the parole plan. Mr. Felce refused to sign the rules or to voluntarily agree to take the "medication." Nevertheless, on November 13, 1990, Mr. Felce signed the parole rules under protest, claiming that he would get an attorney to challenge the rule requiring medication. On that same day, Mr. Felce was released on parole. Agent Schansberg accompanied Mr. Felce to Dr. Taman's office, where Dr. Taman gave Mr. Felce his first injection of Prolixin Decanoate. Since that date, Mr. Felce has continued to receive monthly injections of Prolixin and remains on mandatory release supervision.

### B. *District Court Proceedings*

Mr. Felce filed suit on March 6, 1991, in the United States District Court for the Western District of Wisconsin. Mr. Felce named three defendants: Patrick Fiedler, Secretary of the Wisconsin Department of Corrections, Earl "Andy" Brunk, Regional Supervisor of the Wisconsin Department of Corrections, and James Schansberg, the Parole Agent assigned to Mr. Felce. Mr. Felce sought compensatory damages, costs, attorneys fees, and "such other and further relief as the court may deem to be just and equitable." On July 31, 1991, the district court granted Mr. Felce's request to amend his complaint to add David Dhein, Unit Supervisor of Parole Agent Schansberg, as an additional defendant, and to add a prayer for exemplary damages. The parties filed cross-motions for summary judgment.

The district court's analysis began with a discussion of *Washington v. Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), in which the Supreme Court upheld the State of Washington's regulations governing the procedure for forcibly administering antipsychotic drugs to state prisoners. Mr. Felce had argued that Wisconsin was required to follow the procedures upheld in *Harper*—including a hearing before a neutral committee—before the state could make antipsychotic drug treatment a condition of mandatory release parole. The district court disagreed and held that the Court in *Harper* had relied upon the Washington regulation, not the Due Process Clause, as the source of the liberty interest. The district court noted that, while Wisconsin has similar regulations for prison inmates, it has no regulation governing the use of antipsychotic drugs as a condition of parole. Furthermore, the district court noted, while Wisconsin has created a protectible liberty interest in mandatory release parole, no Wisconsin statute or regulation creates an expectancy or entitlement in "condition-free" parole. The district court found no relevant liberty interest arising from the Due Process Clause. The court distinguished *Harper* on this issue on the ground that, "[u]nlike the inmate in *Harper*, plaintiff has a choice. He may refuse to take the drugs and decide instead to return to prison." Mem. Op. of September 27, 1991 (R.51) at 6. The district court also noted that the Supreme Court has stated that a parolee's activities may be restricted substantially, *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972), and conditions of parole have been upheld where they were "reasonably and necessarily related to the advancement of some justifiable purpose of imprisonment." *Birzon v. King*, 469 F.2d 1241, 1243 (2d Cir.1972). Without determining whether the condition of forced administration of antipsychotic

drugs met this standard, the district court held that Mr. Felce had no protectible liberty interest arising from either Wisconsin law or the Due Process Clause. On this basis, and without reaching the issues of adequate procedure, qualified immunity, or appropriate relief, the district court granted the defendants' motion for summary judgment and denied Mr. Felce's cross-motion for summary judgment.

## II

## ANALYSIS

### A. *Applicable Standards*

We review de novo a district court's grant of summary judgment. *Doe v. Allied–Signal Inc.*, 925 F.2d 1007, 1008 (7th Cir.1991). Our task is to determine whether the record reveals that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). We " 'must view the record and all inferences drawn from it in the light most favorable to the party opposing the motion.' " *Lohorn v. Michal*, 913 F.2d 327, 331 (7th Cir.1990) (quoting *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir.1989)). While any inferences drawn from the facts must be viewed in the light most favorable to the non-moving party, only reasonable inferences need be made. *Hermes v. Hein*, 742 F.2d 350, 353 (7th Cir.1984); *Korf v. Ball State Univ.*, 726 F.2d 1222, 1226 (7th Cir.1984).

Mr. Felce claims that Wisconsin cannot condition mandatory release parole on forced injections of antipsychotic drugs unless antipsychotic drugs are medically necessary and a hearing or some type of fair procedure is used to determine that necessity. To resolve this issue, we must employ the two-step, substance/procedure analytical approach mandated by the Supreme Court in *Washington v. Harper*, 494 U.S. 210, 220, 110 S.Ct. 1028, 1036, 108 L.Ed.2d 178 (1990):

It is axiomatic that procedural protections must be examined in terms of the substantive rights at stake. But identifying the contours of the substantive right remains a task distinct from deciding what procedural protections are necessary to protect that right. "[T]he substantive issue involves a definition of th[e] protected constitutional interest, as well as identification of the conditions under which competing state interests might outweigh it. The procedural issue concerns the minimum procedures required by the Constitution for determining that the individual's liberty interest actually is outweighed in a particular instance." *Mills v. Rogers*, 457 U.S. 291, 299, 102 S.Ct. 2442, 2448, 73 L.Ed.2d 16 (1982) (citations omitted).

Thus, our first task is to determine "the contours of the substantive right" by defining "the protected constitutional interest" and the "conditions under which competing state interests might outweigh it." Because prison administration regulations are at issue, we must consider in this analysis the multi-factor reasonableness review set forth in *Turner v. Safley*, 482 U.S. 78, 89–91, 107 S.Ct. 2254, 2261–63, 96 L.Ed.2d 64 (1987). If, as a result of this substantive analysis, we determine that the inmate has such a liberty interest, we then must assess whether the procedures used by Wisconsin to decide whether its interests outweigh an inmate's interest in a particular case are constitutionally sufficient; this is the procedural analysis.

### B. *Substantive Analysis*

#### 1. Liberty interest

Liberty interests "may arise from two sources—the Due Process Clause itself and the laws of the States." *Hewitt v. Helms*, 459 U.S. 460, 466, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983); *Colon v. Schneider*, 899 F.2d 660, 666 (7th Cir.1990). We shall look to each to determine whether Mr. Felce can claim a liberty interest in mandatory release parole without unwanted administration of antipsychotic drugs.

#### a.

In *Washington v. Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), the

Supreme Court addressed the nature and scope of a Washington state prisoner's liberty interest in avoiding the unwanted administration of antipsychotic drugs. As the district court correctly noted, the *Harper* court focused upon the liberty interest that Washington had created through its own statutes and regulations. Under those regulations, a prisoner had the right to refuse antipsychotic drugs unless the state established that he "(1) suffers from a 'mental disorder' and (2) is 'gravely disabled' or poses a 'likelihood of serious harm' to himself, others, or their property," as those terms are defined by state law. *Id.* at 215, 110 S.Ct. at 1033. While the Court's analysis in *Harper* focused upon this state-created liberty interest, the Court also stated that, in the absence of such a state statute, a prisoner could rely directly upon the Due Process Clause for an analogous liberty interest:

> We have no doubt that, in addition to the liberty interest created by the State's Policy, respondent possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment. Upon full consideration of the state administrative scheme, however, we find that the Due Process Clause confers upon respondent no greater right than that recognized under state law.

*Id.* at 221–22, 110 S.Ct. at 1036–37 (citations omitted). Thus, the *Harper* Court noted that a prisoner has a liberty interest in avoiding the unwanted administration of antipsychotic drugs which stems directly from the Due Process Clause. The contours of that liberty interest were not precisely delineated, although they are no greater than the interest recognized by Washington law.

More recently, in *Riggins v. Nevada*, —— U.S. ——, ——, 112 S.Ct. 1810, 1815, 118 L.Ed.2d 479 (1992), the Supreme Court reiterated that the Due Process Clause guarantees a person in criminal custody the right to be free from antipsychotic drugs "absent a finding of overriding justification and a determination of medical appropriateness." Notably, the dissenting Justice also

wrote: "I do not mean in any way to undervalue the importance of a person's liberty interest in avoiding forced medication or to suggest that States may drug detainees at their whim. Under *Harper*, detainees have an interest in avoiding unwanted medication that the States must respect." *Id.* —— U.S. at ——, 112 S.Ct. at 1826 (Thomas, J., dissenting).

### b.

In *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), the Court addressed the due process implications of revoking discretionary parole. The Court held that, once an inmate is granted parole, he acquires a conditional liberty interest in parole that is protectible under the Due Process Clause. In discussing the status of a parolee, the court noted in passing that the state justifiably can condition parole on adherence to certain restrictions:

> *To accomplish the purpose of parole,* those who are allowed to leave prison early are subjected to specified conditions for the duration of their terms. These conditions restrict their activities substantially beyond the ordinary restrictions imposed by law upon an individual citizen. Typically, parolees are forbidden to use liquor or to have associations or correspondence with certain categories of undesirable persons. Typically, also they must seek permission from their parole officers before engaging in specified activities, such as changing employment or living quarters, marrying, acquiring or operating a motor vehicle, traveling outside the community, and incurring substantial indebtedness.

*Id.* at 478, 92 S.Ct. at 2598 (emphasis supplied). The Court thus noted that a parolee's liberty interest is conditional rather than absolute: "Revocation deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special parole restrictions." *Id.* at 480, 92 S.Ct. at 2600. The Court further noted that the justification for these restrictions stems in part from

the parolee's conviction and in part from the need to protect society:

> The State has found the parolee guilty of a crime against the people. That finding justifies imposing extensive restrictions on the individual's liberty. Release of the parolee before the end of his prison sentence is made with the recognition that with many prisoners there is a risk that they will not be able to live in society without committing additional antisocial acts.

*Id.* at 483, 92 S.Ct. at 2601. Despite the state's interest in restrictions, the Court concluded that, once parole is granted, a parolee has a liberty interest that requires "some orderly process, however informal," before parole is revoked.[1]

Also relevant is *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1978), in which the Supreme Court addressed a prisoner's liberty interest in discretionary parole. The prisoner plaintiffs claimed that the State of Nebraska did not afford them sufficient procedural protection before deciding whether to grant them discretionary parole. The Court began its analysis by looking directly to the Due Process Clause as a potential source of a liberty interest. The Court determined that, because prisoners are not *entitled* to discretionary parole, but merely *desire* or *expect* it, the Due Process Clause standing alone provides no protectible interest:

> There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence. The natural desire of an individual to be released is indistinguishable from the initial resistance to being confined. But the conviction, with

all its procedural safeguards, has extinguished that liberty right: "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty." *Meachum v. Fano*, 427 U.S. 215, 224 [96 S.Ct. 2532, 2538, 49 L.Ed.2d 451] (1976).

*Greenholtz*, 442 U.S. at 7, 99 S.Ct. at 2104. The Court distinguished *Morrissey* on the ground that "[t]here is a crucial distinction between being deprived of a liberty one has, as in parole, and being denied a conditional liberty that one desires." *Id.* at 9, 99 S.Ct. at 2105. Nevertheless, the Court looked to the language of the Nebraska statute and determined that the mandatory language and structure of the statute created an "expectancy of release" which, once created by state law, was protectible under the Due Process Clause. *Id.* at 12, 99 S.Ct. at 2106. Again, in *Board of Pardons v. Allen*, 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987), the Supreme Court held that a state may choose to create a protectible interest in parole by the use of mandatory language and substantive predicates to cabin the discretion of authorities.

■■■ In sum, *Morrissey, Greenholtz,* and *Allen* establish that, while the Due Process Clause standing alone, creates no cognizable liberty interest in being granted parole, a state may create such an interest by state law. These cases also recognize that the liberty interest created by the grant of parole is, by its nature, a conditional liberty interest that may be circumscribed to "accomplish the purpose of parole." *Morrissey*, 408 U.S. at 478, 92 S.Ct. at 2598.

### c.

We now turn to an assessment of the case before us and determine the nature of

---

1. *Id.* at 482, 92 S.Ct. at 2601. Hesitating to prescribe a "code of procedure," the Court nevertheless stated that a parolee has a right to a preliminary hearing to determine whether there is probable cause to believe that the parolee violated a parole condition, and then a final hearing, including:

   (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a "neutral and detached" hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and the reasons for revoking parole.

   *Id.* at 489, 92 S.Ct. at 2604.

the liberty interest (if any) possessed by Mr. Felce.

### (i) liberty interest in parole

■ As we already have noted, in *Greenholtz* and *Allen,* the Supreme Court made clear that a state may create a liberty interest in parole by using mandatory language (*e.g.,* "shall") to create a presump-

tion that parole will be granted when objective criteria are met. Wisconsin's mandatory release statute clearly creates such an interest. Wis.Stat.Ann. § 302.11, leaves no room for uncertainty: all state inmates are entitled to mandatory release on parole when they have completed two-thirds of their sentence, unless they have violated prison regulations so as to extend the date of their mandatory release.[2] Unlike the

2. In full, the statute provides:

302.11 Mandatory release

(1) The warden or superintendent shall keep a record of the conduct of each inmate, specifying each infraction of the rules. Except as provided in subs. (1m), (7) and (10), each inmate is entitled to mandatory release on parole by the department. The mandatory release date is established at two-thirds of the sentence. Any calculations under this subsection or sub. (2)(b) resulting in fractions of a day shall be rounded in the inmate's favor to a whole day.

(1m) An inmate serving a life term is not entitled to mandatory release. Except as provided in s. 973.014, the parole commission may parole the inmate as specified in s. 304.-06(1).

(1p) An inmate serving a term subject to s. 161.49(2) is entitled to mandatory release, except the inmate may not be released before he or she has complied with s. 161.49(2).

(2)(a) Any inmate who violates any regulation of the prison or refuses or neglects to perform required or assigned duties is subject to extension of the mandatory release date as follows: 10 days for the first offense, 20 days for the 2nd offense and 40 days for the 3rd or each subsequent offense.

(b) In addition to the sanctions under par. (a), any inmate who is placed in adjustment, program or controlled segregation status shall have his or her mandatory release date extended by a number of days equal to 50% of the number of days spent in segregation status. In administering this paragraph, the department shall use the definition of adjustment, program or controlled segregation status under departmental rules in effect at the time an inmate is placed in that status.

(c) No extension under this section may require the inmate to serve more days in prison than provided for under the sentence.

(3) All consecutive sentences shall be computed as one continuous sentence.

(4) An inmate may waive entitlement to mandatory release if the department agrees to the waiver.

(5) Before a person is released on parole under this section, the department shall so notify the municipal police department and the county sheriff for the area where the person will be residing. The notification requirement does not apply if a municipal department or county sher-

iff submits to the department a written statement waiving the right to be notified.

(6) Any inmate released on parole under sub. (1) or s. 304.02 or 304.06(1) is subject to all conditions and rules of parole until the expiration of the sentence or until he or she is discharged by the department. Except as provided in ch. 304, releases from prison shall be on the Tuesday or Wednesday preceding the release date. The department may discharge a parolee on or after his or her mandatory release date or after 2 years of supervision.

(7)(a) The division of hearings and appeals in the department of administration, upon proper notice and hearing, or the department of corrections, if the parolee waives a hearing, may return a parolee released under either sub. (1) or s. 304.02 or 304.06(1) to prison for a period up to the remainder of the sentence for a violation of the conditions of parole. The remainder of the sentence is the entire sentence, less time served in custody prior to parole. The revocation order shall provide the parolee with credit in accordance with ss. 304.072 and 973.155.

(b) A parolee returned to prison for violation of the conditions of parole shall be incarcerated for the entire period of time determined by the department of corrections in the case of a waiver or the division of hearings and appeals in the department of administration in the case of a hearing under par. (a), unless paroled earlier under par. (c). The parolee is not subject to mandatory release under sub. (1). The period of time determined under par. (a) may be extended in accordance with sub. (2).

(c) The parole commission may subsequently parole, under s. 304.06(1), and the department may subsequently parole, under s. 304.02, a parolee who is returned to prison for violation of a condition of parole.

(d) A parolee who is subsequently released either after service of the period of time determined by the department of corrections in the case of a waiver or the division of hearings and appeals in the department of administration in the case of a hearing under par. (a) or by a grant of parole under par. (c) is subject to all conditions and rules of parole until expiration of sentence or discharge by the department.

(8) The department may promulgate rules under ch. 227 establishing guidelines and criteria for the exercise of discretion under this section.

discretionary parole statutes at issue in *Greenholtz* and *Allen*,[3] which involve a parole board's weighing factors to determine whether or not to release an inmate on parole, the Wisconsin statute leaves no room for discretion in mandatory release; when an inmate has served two-thirds of his sentence (adjusted for time served in administrative segregation or for rules violations), the inmate is entitled to be released.

A mandatory release parolee is a prisoner released pursuant to [the predecessor to § 302.11] when he has served his sentence less credits for good time granted and not forfeited. He is referred to as a mandatory release parolee because the department has no discretion to deny his release unless the prisoner waives his good time. The mandatory release parolee is distinguished from the discretionary parolee. The latter is released at the discretion of the department under [the predecessor to § 304.06] when he or she has served a minimum portion of the sentence.

*State ex rel. Bieser v. Percy,* 97 Wis.2d 702, 295 N.W.2d 179, 181 (Wis.Ct.App.1980) (citation omitted). Thus, for the reasons articulated by the Court in *Greenholtz* and *Allen,* we agree with Mr. Felce that Wisconsin's mandatory release statute creates a protectible liberty interest.

**(ii) prisoner's liberty interest in freedom from antipsychotic drugs**

■ As noted, in *Harper* the Supreme Court reviewed a Washington regulation, "Policy 600.30," which provided state inmates substantive and procedural protections from involuntary treatment with antipsychotic drugs. The Court noted that, "[a]s a matter of state law, the Policy itself undoubtedly confers upon respondent a right to be free from the arbitrary administration of antipsychotic medication." *Harper,* 494 U.S. at 221, 110 S.Ct. at 1036. More specifically, the Court found:

> By permitting a psychiatrist to treat an inmate with antipsychotic drugs against his wishes only if he is found to be (1) mentally ill and (2) gravely disabled or dangerous, the Policy creates a justifiable expectation on the part of the inmate that the drugs will not be administered unless those conditions exist.

*Id.* Under Wisconsin law, Wis.Admin.Code § DOC 314.08, prison officials cannot force a Wisconsin inmate to take antipsychotic drugs unless the inmate has been formally committed to a state mental health facility, either on an inpatient or outpatient basis.[4]

---

(9) This section applies to persons committing offenses occurring on or after June 1, 1984, or persons filing requests in accordance with 1983 Wisconsin Act 528, section 29(2) or (3).
(10) An inmate subject to an order under s. 48.366 is not entitled to mandatory release and may be *released or discharged only as provided* under s. 48.366.
Wis.Stat.Ann. § 302.11 (formerly § 53.11).

**3.** *See* Wis.Stat.Ann. § 304.06.

**4.** *There is an exception, however, for emergencies.* In full, the statute provides:
**DOC 314.08 Involuntary treatment with psychotropic medication** An inmate may be treated involuntarily with psychotropic medications only under the following circumstances:
(1) In an emergency, after reasonable interpersonal efforts have failed to resolve the emergency and if after the brief use of mechanical restraints the inmate continues to *struggle unduly, the attending clinical psychologist,* clinical social worker or physician shall determine whether an emergency transfer to a state treatment facility under s. 51.-

37(5)(b), Stats., is appropriate. Pending that determination, the attending physician may order involuntary treatment with psychotropic medication. The inmate may be treated involuntarily with psychotropic medications for as long as it takes to determine whether to initiate emergency transfer proceedings or for 72 hours, whichever is shorter. If an emergency transfer is initiated, the attending physician may order continued involuntary treatment with psychotropic medications pending completion of the transfer proceedings. In this subsection, "emergency" means a *situation* in which:
(a) The inmate's contact with reality appears to be severely impaired as a result of mental illness; and
(b) The inmate appears to pose an immediate danger to self or others, evidenced by a recent overt act or attempt to inflict serious bodily harm;
(2) While the inmate is in a state treatment facility under an involuntary commitment under *ch.* 51, *Stats.,* for treatment of mental illness; or
(3) If the inmate is committed under s. 51.-20(1)(ar), Stats., as an outpatient in a correc-

The involuntary commitment statute, Wis. Stat.Ann. § 51.20, provides extensive procedural guarantees, most of which are the same both for state inmates and for ordinary citizens.[5] Through these statutes and regulations, Wisconsin has created for prisoners a protectible liberty interest in avoiding unwanted antipsychotic drug treatment.

### (iii) mandatory parolee's interest in freedom from antipsychotic drugs

If Mr. Felce has a liberty interest in being free from antipsychotic drugs while in a mandatory parole status, that liberty interest must be found, as we have previously noted, in either state law or in the Due Process Clause itself. *See Hewitt v. Helms*, 459 U.S. at 466, 103 S.Ct. at 868–69. When we turn to state law, we find an unexplainable void in an otherwise comprehensive state regulation of involuntary treatment with antipsychotic drugs. Even a casual reading of the applicable Wisconsin statutes and administrative code sections makes it clear that Wisconsin, as a matter of public policy, has approached the issue of the involuntary use of these mind-altering drugs with great caution. While the Wisconsin Attorney General suggests that this void indicates legislative-administrative acquiescence in giving corrections authorities very broad discretion in the parole situation, that bare assertion has a hollow ring when made against the backdrop of Wisconsin's policy choices in every other situation. Indeed, we note that, in its prison regulations, the Wisconsin Department of Corrections, which also administers the parole system, pointedly notes that the "department considers involuntary treatment for mental illness of adult inmates to be the form of treatment of last resort." Wis.Admin.Code § DOC 314.01.

We are skeptical of the assertion that Wisconsin has given its corrections authorities a free hand with respect to antipsychotic drug therapy as a condition of parole while having restricted it drastically with respect to inmates. Nonetheless, the absence of state law and regulation with respect to parole makes it impossible for us to agree with Mr. Felce that Wisconsin has

tional institution, and the inmate refuses to take the medication voluntarily. A health services treatment staff member or a physician shall distribute or administer medications to committed inmates being treated on an outpatient basis in a correctional institution. The following steps shall be followed:

(a) The inmate shall be given an opportunity to take the medication voluntarily by a health services unit staff member or a physician. If it is not possible to comply with s. DOC 314.07(1) due to the inmate's behavior, the staff member or physician shall record the reasons for this in the inmate's clinical or medical services record;

(b) If the inmate refuses, the health services staff member or physician shall counsel the inmate and attempt to persuade the inmate to take the medication;

(c) If the inmate continues to refuse, the attending physician shall be contacted to assess the situation. The attending physician, at his or her discretion, shall decide the course of action to be taken. Possible actions include:

1. Take no action for a period of time;
2. Send the inmate to a special unit within the institution for treatment of mental illness;
3. When appropriate, put the inmate in observation status pursuant to ch. DOC 311;
4. Recommend transfer to a more appropriate correctional institution;
5. Recommend transfer to a state treatment facility, if appropriate under s. 51.20(1)(ar), Stats.; or
6. Direct that the inmate be ordered to take the medication and that force be used to administer it, if necessary;

(d) If directed by the attending physician, order the inmate to take the medication; and

(e) If the inmate persists in refusing to take the medication, administer it involuntarily.

5. The involuntary commitment statute, Wis.Stat. Ann. § 51.20, is too lengthy to merit reprint in full. In part, the statute requires notice, a judicial hearing (both a preliminary, probable cause hearing as well as a trial), legal counsel, the right to present and cross-examine witnesses, and the right to a jury trial. In the case of a state inmate, the state must establish "that the inmate is mentally ill, is a proper subject for treatment and is in need of treatment," that less restrictive forms of treatment have been tried, and that a licensed physician or licensed psychologist recommends commitment. If, after the initial hearing, the court finds that there is probable cause to believe that the state will establish the relevant criteria, the court must appoint two independent psychiatrists, or one psychiatrist and one psychologist, one of whom may be chosen by the inmate, to examine the inmate and render a professional opinion. The decision may be appealed to the state court of appeals.

given mandatory parolees a liberty interest in avoiding antipsychotic drug therapy. While Wisconsin authorities may fill this gaping hole in its regulatory structure, we must, absent such action by the state, rest our decision on the strictures of the Due Process Clause, as recognized by the Supreme Court in *Harper* and *Riggins.*

We believe that *Harper* and *Riggins* make it clear that there is a liberty interest in not being subjected involuntarily to the administration of such drugs except when there is an "overriding justification for their use and a determination of medical appropriateness." *Riggins,* —— U.S. at ——, 112 S.Ct. at 1815. Therefore, we conclude that a parolee has a liberty interest in being free from the involuntary use of such drugs, although, as we shall detail below, that is not an unqualified one.

2. State interests that limit the liberty interest

We turn to the second stage of the substantive analysis: the identification of the conditions under which Wisconsin considers its own interests to outweigh an individual parolee's relevant liberty interest, and the reasonableness of those conditions. *See Harper,* 494 U.S. at 220, 110 S.Ct. at 1035–36. The state argues that it has a greater interest in using antipsychotic drugs to control the behavior of a parolee than to control the behavior of a prisoner. In prison, the walls, guards, and other measures which are less intrusive than antipsychotic drugs can be used to protect society, other prisoners, and the inmate himself from his antisocial behavior while behind bars. Once released on parole, however, the state loses the ability to utilize these less restrictive means, and thus must have a freer hand in utilizing other forms of behavior control, such as antipsychotic drugs in order to protect the public from the parolee's potential for violent or antisocial behavior. For this reason, the state suggests, the set of conditions that it can impose on a parol-

ee is a different set from, rather than a subset of, the conditions it can place on a prisoner. Furthermore, the state argues that the liberty interest against forced administration of antipsychotic drugs in prison does not overlap the liberty interest in mandatory release parole because, unlike a prisoner forced to take the drug, a parolee can choose to avoid the drugs by foregoing parole and serving the remainder of his sentence in prison.

As the defendants point out, in *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987), the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Indeed, in *Harper,* the Court confirmed that this standard applies whenever constitutional rights and prison administration collide:

> Our earlier determination to adopt this standard of review was based upon the need to reconcile our longstanding adherence to the principle that inmates retain at least some constitutional rights despite incarceration with the recognition that prison authorities are best equipped to make difficult decisions regarding prison administration. These two principles apply in all cases in which a prisoner asserts that a prison regulation violates the Constitution, not just those in which the prisoner invokes the First Amendment. We made quite clear that the standard of review we adopted in *Turner* applies to all circumstances in which the needs of prison administration implicate constitutional rights.

*Harper,* 494 U.S. at 223–24, 110 S.Ct. at 1038 (citations omitted). We have no reason to doubt that this basic analysis is just as applicable to parole as to prison situations.

In *Harper,* the Supreme Court concluded that the *Turner* considerations,[6]

---

6. *Turner* identified the following factors. First, noted the Supreme Court, a court should determine whether there is a " 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." 482 U.S. at 89, 107 S.Ct. at 2262. Second, a court should consider "whether there are alternative means of exercising the rights that remain open to prison inmates." *Id.* at 90, 107 S.Ct. at 2262. Third, a court should weigh

when properly applied, supported the use of antipsychotic drugs in the prison setting, at least where the inmate has a serious mental illness, is dangerous to himself or others, and the treatment is in the inmate's medical best interests. *Harper*, 494 U.S. at 227, 110 S.Ct. at 1039; *accord Riggins*, —— U.S. at ——, 112 S.Ct. at 1815. We believe that these same *Turner* considerations can justify the use of antipsychotic drugs during a period of parole. In the Wisconsin scheme, parole is "an extension of the prison walls," *Hauser v. Carballo*, 82 Wis.2d 51, 261 N.W.2d 133, 135 (1978), and the basic responsibility of the Department of Corrections toward the inmate is no less during that period than during incarceration. Moreover, as the Supreme Court noted "[w]here an inmate's mental disability is the root cause of the threat he poses to the inmate population, the State's interest in decreasing the danger to others necessarily encompasses an interest in providing him with medical treatment for his illness." *Harper*, 494 U.S. at 225–26, 110 S.Ct. at 1039. When a parolee is permitted significant unsupervised contact with the community, the responsibility of the Department not only continues but, in a very real sense, heightens. In the parole setting, the state arguably loses a significant number of the alternate methods it has at its disposal in the prison setting to deal with the prisoner's illness and the resultant behavior. This factor may, *in the judgment of competent medical authority*, increase the necessity of resort to these medications in some situations. On the other hand, the state's responsibility to the parolee includes the obligation to prepare him for even more complete reintegration into society. This factor again must be weighed with the advice of competent medical authority in determining the appropriateness of continued medication.

As noted earlier, Wisconsin does not have a specific regulation governing the determination of when antipsychotic drug treatment can be imposed as a condition of parole. The general regulation governing parole supervision allows parole staff to establish probation conditions designed to "achieve the goals and objectives" of parole. Wis.Admin.Code § DOC 328.04(3)(1). The same regulation states that the goals and objectives of parole are: "to help the client be successfully reassimilated into the community, help the client adjust to and cope with community living, reduce crime, and protect the public." Wis.Admin.Code § DOC 328.04(1). These general regulations hardly embody the premise of *Harper* and *Riggins* that the use of antipsychotic drugs be justified on medical grounds for the treatment of the mentally ill parolee. Therefore, to the extent the State relies upon these general regulations as providing sufficient guidance for imposing parole conditions, its reliance is misplaced. Under the mandatory parole statute, Mr. Felce had a right to parole subject to conditions that both achieved the state's legitimate goals for the parole period and conformed to constitutional standards.

■ In short, we believe that the liberty interest against involuntary use of antipsychotic drugs guaranteed by the Due Process Clause for parolees is essentially the same as that recognized for those incarcerated in an institutional setting. While the weight given particular circumstances in the application of the *Turner* reasonableness analysis may be somewhat different in the parole situation than in the prison situation, the basic responsibility of the state to the inmate and those around him remains constant despite the change in the degree of physical custody. Accordingly, we believe that Mr. Felce has a conditional liberty interest in being free from the involuntary use of antipsychotic drugs during his period of mandatory parole. Before the use of such drugs can be made a condition

"the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* Fourth and finally, a court should consider the existence or absence of ready alternatives. While this is not a "least restrictive alternative" test, "if an inmate can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91, 107 S.Ct. at 2262.

of his continued parole, the state must demonstrate that such administration is medically indicated to accomplish the goals of the parole program of reintegrating Mr. Felce into the community.

## C. *Constitutionally Adequate Procedural Protections*

"Having determined that state law recognizes a liberty interest, also protected by the Due Process Clause, which permits refusal of antipsychotic drugs unless certain preconditions are met, we address next what procedural protections are necessary to ensure that the decision to medicate an inmate against his will is neither arbitrary nor erroneous under the standards we have discussed above." *Harper,* 494 U.S. at 228, 110 S.Ct. at 1040. As the Court has repeatedly stressed, "[t]he procedural protections required by the Due Process Clause must be determined with reference to the rights and interests at stake in the particular case." *Id.* at 229, 110 S.Ct. at 1040–41 (collecting cases). This inquiry requires us to assess the relative weight of several factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). In the setting of this case, the application of this analytical model requires that we accommodate a parolee's "liberty interest in avoiding the forced administration of antipsychotic drugs and the State's interests in providing appropriate medical treatment to reduce the danger that [a parolee] suffering from a serious mental disorder represents to himself and to others." *Harper,* 494 U.S. at 236, 110 S.Ct. at 1044.

As we undertake this analysis, we again note, as a threshold matter, that we perceive little reason to distinguish the parole situation from the prison situation. In terms of the *Mathews* factors, the relationship of the parties—both in terms of their responsibilities and prerogatives—remains essentially unaltered. Consequently, we find the Supreme Court's analysis in *Harper* to be a very important guide. Nevertheless, it deserves emphasis that, while the Supreme Court found adequate the *Harper* decision-making mechanism,[7] its decision did not announce a rigid constitutionally-based model to be followed throughout the Nation. However, the Court's analysis does distill the basic factors that must guide our inquiry.

1.

First, we consider Mr. Felce's interest in avoiding unwanted and unnecessary antipsychotic drug treatment. As the *Harper* court noted, this interest is significant: "The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty. The purpose of the drugs is to alter the chemical balance in a patient's brain, leading to changes, intended to be beneficial, in his or her cognitive processes." *Harper,* 494 U.S. at 229, 110 S.Ct. at 1041 (citations omitted). The *Physicians' Desk Reference,* 1728 (45th ed. 1991) describes Prolixin, the drug currently administered to Mr. Felce, as "a highly potent behavior modifier with a markedly extended duration of effect." Moreover, "[w]hile the therapeutic benefits of antipsychotic drugs are well documented, it is also true that the drugs can have serious, even fatal

7. In *Harper,* the Supreme Court found that the Due Process Clause was satisfied by review by a special committee consisting of a psychologist, a psychiatrist, and an official of the Washington's Special Offender Center, none of whom were involved in the inmate's diagnosis or treatment. It was further required that the psychiatrist had to be in the majority if medication was to be ordered. The inmate had the right to a hearing, the right to attend, present witnesses, be represented by a lay advisor versed in the psychological issues and the right to appeal to the Center's Superintendent. Periodic review of the decision to medicate was mandated and state court review of the Committee's decision permitted.

side effects." *Harper*, 494 U.S. at 229, 110 S.Ct. at 1041. These potential adverse side effects include involuntary muscle spasms, motor restlessness, neuroleptic malignant syndrome—"a relatively rare condition which can lead to death from cardiac dysfunction"—and tardive dyskinesia, "a neurological disorder, irreversible in some cases, that is characterized by involuntary, uncontrollable movements of various muscles, especially around the face." *Id.* at 229–30, 110 S.Ct. at 1041; *see also Riggins*, —— U.S. at —— –——, 112 S.Ct. at 1814–15. Thus, Mr. Felce's interest in avoiding antipsychotic drug treatment is significant.

### 2.

Next, we consider the risk of an erroneous deprivation of this interest through the procedures used by the defendants, and the probable value, if any, of additional or substitute procedural safeguards. The defendants stress at this juncture that the decision to require Mr. Felce to take antipsychotic drugs was arrived at only after a thorough review of his prison records, his medical records, as well as communication with Mr. Felce's family, prior parole officers, social workers, and physicians. In particular, Agent Schansberg points to the letter of October 8, 1990, that he received from Dr. Taman, a psychiatrist who examined Mr. Felce once in 1975 and a second time in February 1990. Dr. Taman wrote that, based upon a review of his prior examinations and of Mr. Felce's medical and prison records, he recommended that Mr. Felce undergo antipsychotic drug treatment. The defendants submit that the decision to require Mr. Felce to take antipsychotic drugs as a condition of parole was thus not the product of "unsophisticated north woodsmen who took it upon themselves to decide that it would be a good idea to require plaintiff to be involuntarily injected with an antipsychotic drug," but the product of professional medical judgment by Dr. Taman and a thorough review of Mr. Felce's medical and prison records. Appellee's Br. at 28.

Our review of the record indicates that the defendants had a substantial basis for concern that Mr. Felce might engage in antisocial, and perhaps violent, behavior upon release. Mr. Felce had made numerous threats of violence to prison officials and had repeated his desire to injure his exwife. In addition, more than one medical professional had recommended antipsychotic drug treatment in the six years or so that Mr. Felce had been in custody. Nevertheless, other evidence in the record suggests that the defendants were aware that Mr. Felce was not committable and thus, under Wisconsin law, could not be forced to undergo antipsychotic drug therapy as an inmate. In November 1989, before Mr. Felce was originally scheduled for mandatory release, Thomas Biever, the clinical services director at Mr. Felce's prison, arranged for Mr. Felce to be transferred to the Wisconsin Resource Center for an evaluation as to whether Mr. Felce could be involuntarily committed. In his report on this transfer, Biever acknowledged doubt that Mr. Felce met the standard for involuntary commitment:

> There has been question about whether or not Mr. Felce is a person who could be recommended for civil commitment under chapter 51. The record clearly indicates that although Mr. Felce has serious personality problems, he is not necessarily a person who meets the criteria for civil commitment. However, in the interest of having a second opinion, he has been recommended for transfer to the Resource Center for that evaluation and opinion.

R.43 Ex.113. On November 22, 1989, following a psychological examination of Mr. Felce, Wisconsin Resource Center officials determined that he was not a candidate for involuntary commitment under Wis.Stat. Ann. § 51.20. R.28 Ex.L. Three months later, Becky Mladnick, who was then Mr. Felce's parole agent, scheduled an appointment for Mr. Felce to meet with Dr. Taman. Agent Mladnick wrote a letter to Dr. Taman in advance of the examination, in which she informed the doctor that, among his many threats of violence, Mr. Felce had threatened to kill her. Agent Mladnick told Dr. Taman that she hoped he could

recommend treatment with antipsychotic drugs.

> I had hoped to get a commitment for this man prior to his release from prison and with the court's backing force medication. The client's mother, father, and ex-wife all say that the medication he received in the past (I believe it was a monthly injection of Prolixen [sic]) markedly improved his behavior. The family believes it is the only way he will be able to stay out of trouble.
>
> . . . .
>
> What I want is for this guy to get treatment so he is not a danger.

R.43 Ex.115. Dr. Taman examined Mr. Felce, diagnosed him as *suffering from* "probable delusional disorder, past persecutory type" and recommended, "[b]ased on the fact that he has responded to antipsychotics in the past, I believe that a trial of the same would be beneficial." R.42 Ex. 126 at 2–3. Two months later, on April 6, 1990, Mr. Felce was examined by Robert DeYoung, Ph.D., a staff psychologist at the Waupun Correctional Institution. Dr. DeYoung's professional opinion was that, although Mr. Felce was showing symptoms of a paranoid personality disorder, he was not mentally ill.

> Although there is some evidence in this individual's record that he has manifested paranoia to the point of being psychotic, he currently does not manifest the symptoms of a mental illness. He is seen as manifesting the characteristics of a paranoid personality disorder. He also has a history of alcohol and drug abuse which have significantly contributed to his problems. He is currently not amenable to any type of treatment. It is recommended that he be placed within a regular prison population and that he be monitored by Clinical Services. If significant deterioration should occur, he may be in need of psychiatric medication.

R.43 Ex.117 at 2. Thus, there was evidence in Mr. Felce's medical record to suggest that his personality problems were not *severe enough to require* antipsychotic drug therapy. Furthermore, the recommendation from Dr. Taman followed specific requests from Agent Mladnick and Agent Schansberg—both of whom were apparently threatened by Mr. Felce—for such a recommendation.

■ Thus, the record reflects that the procedure followed by the defendants was insufficiently neutral and independent to guard against an erroneous determination that Mr. Felce was an appropriate subject for antipsychotic drug treatment. The parole plan, while devised with medical *advice*, was not subject to independent medical evaluation. Therefore, there was no safeguard against the imposition of a plan that was not justified medically. While medical opinions are present, they vary significantly in their assessment and, given the time span involved, in their relevance. At no time was this data subject to evaluation by a neutral decisionmaker.

■ Nevertheless, the defendants point to two procedural safeguards that were in place to protect Mr. Felce against an erroneous deprivation of his liberty interest: the parole grievance procedure, and the parole revocation process. The grievance procedure was brought to Mr. Felce's attention through the last line on the "Probation/Parole Rules" sheet he was given by Agent Schansberg, which read:

> As established by Administrative Rule DOC 328.11, you have an opportunity for administrative review of certain types of decision through the client complaint process.

R.28 Ex.N. The state provides us with little information on the procedure in its brief. Appellee's Br. at 23 n. 1. However, from our independent review of the regulations, we have obtained sufficient information to make it clear that, in this context, this procedure does not comply with due process. The grievance procedure, as set forth in Wis.Admin.Code § DOC 328.11, allows a parolee to file a complaint with the parole agent, and have that complaint reviewed by three levels of administrators: the parole agent's supervisor (*e.g.*, defendant Dhein, supervisor to Agent Schansberg), the regional chief (*e.g.*, defendant Brunk), and the administrator of probation and parole. The administrator's decision is

final and non-appealable. The process is all done in writing and all within the parole division of the Wisconsin Department of Corrections; there is no opportunity for an independent or neutral decisionmaker to pass judgment. This procedure provides only minimal opportunity for the parolee to present his case, *see Harper*, 494 U.S. at 235, 110 S.Ct. at 1044; *Vitek v. Jones*, 445 U.S. 480, 494–96, 100 S.Ct. 1254, 1264–65, 63 L.Ed.2d 552 (1980), and has no provision for review by persons not currently involved in his diagnoses or treatment. None of the decisionmakers need possess any medical qualifications. Finally, the procedures of the Department explicitly require that the condition (*i.e.,* medication with antipsychotic drugs) be met while the review process is underway. Therefore, even assuming expedited consideration, *see* DOC 328.11(10), this procedure affords Mr. Felce no adequate way of avoiding the administration of the drugs.

The defendants also suggest that the parole revocation process provided sufficient procedural protection to Mr. Felce's liberty interest. The parole revocation process is governed by Wis.Stat.Ann. § 304.-06(3) and Wis.Admin.Code §§ DOC 331.01 to 331.16. Neither the statute nor the regulations contain any provision concerning a challenge to the conditions of parole; both focus the attention of the process on a determination whether the parolee has violated the condition of parole and, if so, if revocation should result. As a general rule, the only issue at a parole revocation hearing is whether the parolee has violated a condition of parole and, if so, whether that violation is serious enough to require that parole be revoked.[8] The defendants have not submitted to us, nor have we uncovered any legal reference which states

that Wisconsin parole revocation hearings are an exception to this rule.

Turning to the third *Mathews* factor, we next consider the probable value, if any, of additional or substitute procedural safeguards. We begin by noting that the Court has repeatedly emphasized the value of an independent decisionmaker in a context such as this. *Harper*, 494 U.S. at 233, 110 S.Ct. at 1043 ("Adequate procedures exist here. In particular, independence of the decisionmaker is addressed to our satisfaction by these procedures."); *Vitek*, 445 U.S. at 494–96, 100 S.Ct. at 1264–65; *Morrissey*, 408 U.S. at 489, 92 S.Ct. at 2604. Of course, a decisionmaker need not be external to an institution to be independent; a panel of prison officials (including prison medical professionals) was approved in *Harper*, 494 U.S. at 233–35, 110 S.Ct. at 1042–44. But under the procedure described by the defendants, the persons who make the decision whether to condition mandatory release parole on antipsychotic drug treatment are not independent, but involved in Mr. Felce's diagnosis and treatment. Agent Schansberg, the primary decisionmaker, may have felt threatened by Mr. Felce; Mr. Felce had threatened to kill his previous parole agent, Agent Mladnick. The physician whose recommendation was relied upon, Dr. Taman, was not entirely independent. He treated Mr. Felce with antipsychotic drugs in 1975, was asked by Agent Mladnick in February 1990 to diagnose Mr. Felce and to prescribe antipsychotic drug therapy, was asked by Agent Schansberg in October 1990 for a similar recommendation, and has treated Mr. Felce since his release on parole. The remaining defendants formed a direct line of supervisors above Agent Schansberg and thus had individual interests in supporting his decision. In contrast, the procedure approved

---

**8.** *See Morrissey v. Brewer*, 408 U.S. 471, 479–80, 92 S.Ct. 2593, 2599, 33 L.Ed.2d 484 (1972) ("The first step in a revocation decision thus involves a wholly retrospective factual question: whether the parolee has in fact acted in violation of one or more conditions of his parole. Only if it is determined that the parolee did violate the conditions does the second question arise: should the parolee be recommitted to prison or should other steps be taken to protect society and improve chances of rehabilitation?"); *State*

*ex rel. Johnson v. Cady*, 50 Wis.2d 540, 185 N.W.2d 306, 310–11 (1971) ("[T]he basic requirements of due process and fairness require that the department provide a limited hearing to allow petitioners to be confronted with their probation violation and to be heard if they so desire."; "The type of hearing we refer to is a factual hearing relating to the grounds of revocation so that, on review, it can be determined whether the department acted arbitrarily and capriciously in ordering revocation.").

in *Harper* involved a committee composed of a psychologist, a psychiatrist, and the Associate Superintendent of the Special Offender Center, "none of whom may be, at the time of the hearing, involved in the inmate's treatment or diagnosis." 494 U.S. at 215, 110 S.Ct. at 1033. A majority vote, including the psychiatrist, is necessary before the inmate can be involuntarily medicated. *Id.* at 215–16, 110 S.Ct. at 1033. Independence such as this provides a significant added dimension of procedural protection to the liberty interest at stake.

Finally, we consider the fourth *Mathews* factor: the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. As the defendants remind us, the state's interest is substantial: the protection of the public—including a parolee's family and community—from antisocial acts of a parolee, as well as the parolee's reassimilation and rehabilitation. The function involved in mandatory release parole is the early release of a prisoner into the community, with parole conditions and supervision to motivate the parolee to avoid past mistakes (and thereby continue on parole) and adjust to life outside prison. Mandatory release parole also saves the state money and alleviates prison overcrowding.

With respect to the fiscal and administrative burdens that an additional or substitute procedural requirement would entail, the parties have failed to offer evidence of the potential burdens of utilizing an independent decision-maker in deciding which parolees are proper candidates for antipsychotic drug treatment. Certainly, the burdens would be no greater than those required when the state seeks to medicate an inmate against his will and, pursuant to state law, must pursue involuntary commitment.

Upon balancing the *Mathews* factors, we are persuaded that the involvement of an independent decisionmaker would benefit significantly the protection of the liberty interest at stake without a significant burden upon either the resources of the state or the substantial interests that the state has in protecting the public and rehabilitating its parolees. Therefore, we conclude that the defendants' current procedure—with its heavy emphasis upon the judgment of the individual parole agent—is constitutionally inadequate.

### D. *Appropriate Relief*

Because the district court resolved the summary judgment motion by finding that Mr. Felce did not have a liberty interest in mandatory release parole without antipsychotic drugs, it did not reach the issue of whether the procedural protections were constitutionally sufficient, let alone the issue of what relief might be appropriate if the procedures were found insufficient. Because we find the procedure insufficient, we must address the issue of appropriate relief.

#### 1. Damages

Mr. Felce seeks compensatory damages "in excess of $50,000" and exemplary damages in the amount of $500 for each time Mr. Felce has been forced to receive an injection of antipsychotic medication. In response to these requests, the defendants plead qualified immunity. The doctrine of qualified immunity shields government officials performing discretionary functions from liability for damages when their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Knowledge of a general right is not sufficient to invoke liability; "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). This test "focuses on the state of the law at the time of the alleged violation." *Zook v. Brown,* 748 F.2d 1161, 1164 (7th Cir. 1984). Thus, in assessing the qualified immunity claim, our concern is whether statutes or caselaw existed in November 1990 to establish clearly that a state prisoner

scheduled for mandatory release parole had a right under the Due Process Clause to have an independent decisionmaker determine the medical need for antipsychotic drug treatment before such treatment was made a condition of parole.

To begin this inquiry, the defendants note that no reported case addresses the procedural protections necessary when parole—either discretionary or mandatory—is conditioned upon antipsychotic drug treatment. Mr. Felce concedes as much, but responds by pointing to *Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), and the Wisconsin statutes and regulations governing forced administration of antipsychotic drugs to prison inmates. Mr. Felce argues that *Harper,* which was decided more than eight months before his parole conditions were drafted, clearly established that antipsychotic drugs cannot be forcibly administered to an inmate without affording that inmate certain procedural protections. In addition, Mr. Felce argues, the Wisconsin statutes made the defendants keenly aware that they had to undertake formal commitment proceedings before administering antipsychotic drugs to an inmate.

■ But neither *Harper* nor the relevant Wisconsin statutes speak directly of the actions of parole agents. A parole agent or parole supervisor would not necessarily find either to establish clearly the need for any procedural requirement prior to adding antipsychotic drug treatment as a condition of parole. We conclude that the defendants are qualifiedly immune from Mr. Felce's requests for damages because the procedural rights were not so clearly established in November 1990 that a reasonable parole agent or supervisor would have known that conditioning Mr. Felce's parole upon antipsychotic drug treatment, without any independent determination of the medical need for such treatment, was violative of Mr. Felce's procedural due process rights.

### 2. Injunctive relief

■ Mr. Felce did not request specifically injunctive relief. Rather, in addition to compensatory and exemplary damages, he merely asked the court "[f]or such other and further relief as the court may deem to be just and equitable." Nevertheless, Federal Rule of Civil Procedure 54(c) provides: "Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." As this court has noted, "Rule 54(c) 'has been liberally construed, leaving no question that it is the court's duty to grant whatever relief is appropriate in the case on the facts proved.' This includes injunctive relief when appropriate, and even when not specifically requested." *Kaszuk v. Bakery and Confectionery Union and Indus. Int'l Pension Fund,* 791 F.2d 548, 559 (1986) (quoting *United States v. Marin,* 651 F.2d 24, 31 (1st Cir.1981)) (citations omitted); *see Travis v. Gary Community Mental Health Ctr.,* 921 F.2d 108, 112 (7th Cir.1990) ("Fed.R.Civ.P. 54(c) requires courts to award the relief to which the prevailing party is entitled, even if that party did not request the relief or relied on the wrong statute."), *cert. denied,* —— U.S. ——, 112 S.Ct. 60, 116 L.Ed.2d 36 (1991); *Williamson v. Handy Button Mach. Co.,* 817 F.2d 1290, 1298 (7th Cir.1987) ("Rule 54(c) was designed to divorce the decision what relief to award from the pleadings and arguments of counsel; the court is to determine, and award, the right relief in each case even if the complaint is silent on the question."). Such relief should not be awarded, however, when doing so would prejudice the defendant. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 424, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975); *Kaszuk,* 791 F.2d at 559 (" 'In particular, a substantial increase in the defendant's potential ultimate liability can constitute specific prejudice barring additional relief under Rule 54(c).' ") (quoting *Atlantic Purchasers, Inc. v. Aircraft Sales, Inc.,* 705 F.2d 712, 716–17 (4th Cir.1983) (prejudice found in belated request for treble damages)). The decision whether to award such relief is within the sound discretion of the district court. *Albemarle Paper,* 422 U.S. at 424,

95 S.Ct. at 2375; *Kaszuk*, 791 F.2d at 559. The district court never reached the issue of injunctive relief, because it concluded that Mr. Felce did not have a protectible liberty interest. Because we have determined that Mr. Felce does have a liberty interest and was not afforded the requisite due process protections, the district court now must address the issue of injunctive relief.

### Conclusion

For the foregoing reasons, the judgment of the district court granting summary judgment to the defendants is reversed. The case is remanded to the district court for further proceedings consistent with this opinion.

REVERSED AND REMANDED