Randy Lee CLOSS, Petitioner,

v.

Douglas WEBER, Warden, South Dakota State Penitentiary, Respondent.

No. Civ. 99–4124.

United States District Court,
D. South Dakota,
Southern Division.

Dec. 23, 1999.

Carolyn K. Dick, Sioux Falls, SD, for petitioner.

Douglas Weber, Sioux Falls, SD, respondent pro se.

Craig M. Eichstadt, Attorney General's Office, Pierre, SD, for respondent.

## MEMORANDUM AND ORDER

PIERSOL, Chief Judge.

Petitioner Randy Lee Closs, a South Dakota inmate, petitions for habeas corpus relief under 28 U.S.C. § 2254. For the reasons stated below, the petition is granted.

### I. Background and Procedural History

On April 12, 1984, when petitioner was twenty-one years old, a South Dakota jury convicted him of second-degree burglary and grand theft in one case and of third-degree burglary and petty theft in a second case. All counts were joined for trial. The trial court sentenced petitioner to fifteen years of imprisonment on the second-degree burglary conviction and ten years on the grand theft conviction, to run concurrently. The trial court sentenced petitioner to ten years of imprisonment on the third-degree burglary conviction and one year on the petty theft conviction, to run concurrently, but the court ordered the ten-year sentence to run consecutively to the fifteen-year sentence, for a total sen-

tence of twenty-five years in the South Dakota State Penitentiary. The South Dakota Supreme Court affirmed on direct appeal. *State v. Closs*, 366 N.W.2d 138 (S.D.1985). Petitioner then launched an unsuccessful collateral attack on his convictions through state and federal habeas corpus petitions. *Closs v. Leapley*, 18 F.3d 574 (8th Cir.1994).

Petitioner has a psychiatric history dating to his teenage years. He carries a diagnosis of schizophrenia, undifferentiated, episodic with inter-episodic residual symptoms. Petitioner has been hospitalized at the South Dakota Human Services Center [1] on four occasions, and he has been treated with numerous psychotropic medications, including Navane, Chlorpromazine, and Haldol. He has also been treated with medications to control side effects of the psychotropic medications. The petitioner has a history of refusing medication and "cheeking" oral medication because of its side effects. There is limited evidence in the record that petitioner may become verbally aggressive and throw objects if he is not taking medication.

Petitioner was first admitted to the Human Services Center on juvenile code status on April 18, 1979, and he was discharged on May 9, 1979. His second admission was also on juvenile code status with an admission date of June 20, 1979, and a discharge date of January 6, 1981. Petitioner's third hospitalization was recorded as a mental illness upon his transfer from prison on January 23, 1990, and he was discharged back to the penitentiary on February 27, 1990 to continue serving his sentences.

Petitioner completed service of the fifteen-year sentence and, on January 28, 1992, he commenced service of his consecutive, ten-year sentence. By the summer of 1997, petitioner was thirty-four years old and had been in prison fourteen years. Petitioner was housed in the Jamison Annex, South Dakota State Penitentiary Mental Health Unit, and he had refused

---

1. This state facility was renamed the George S. Mickelson Center for the Neurosciences.

prescribed medication since January 30, 1997. Notes from Dr. Pesce at the Penitentiary indicated that he observed increased anxiety in petitioner as his potential parole release date neared. Dr. Pesce noted his observation that petitioner was in no way ready to live in society. Dr. Pesce viewed petitioner as quite fragile and not well-equipped to succeed without a lot of support. He recommended inpatient treatment. Petitioner was due to flat-time out of the penitentiary in December 1998.

On June 27, 1997, the Board of Pardons and Paroles granted petitioner parole under SDCL Chapters 24–13 and 24–15. Specifically, pursuant to SDCL § 24–15–11, the Board imposed certain conditions on the petitioner. James D. Sheridan, a Board member, signed and completed a form, placing his initials next to the standard conditions imposed. Those conditions were that the petitioner (1) not consume alcoholic beverages or enter an establishment where alcoholic beverages are the main item of sale while on parole; (2) maintain contact with his parole agent at the agent's discretion; (3) begin and maintain psychological or psychiatric treatment at a facility or with a psychologist or psychiatrist approved by the Board; (4) obtain mental health counseling; and (5) obtain verification of a residence before release. Sheridan also placed his initials next to condition number 11 for "Other" and wrote in his handwriting: "This subj has done enought (sic) time for Burglary. He needs to get into Yankton or some other placement for mentally ill persons." Sheridan dated the form June 27, 1997, and petitioner signed it on July 1, 1997.

A supervising parole agent then completed a parole Agreement which both he and petitioner signed on the same day, July 1, 1997. By placing "XX" next to certain standard conditions set forth in the Agreement, the parole agent transferred into the Agreement the standard conditions imposed by the Board in the form signed on June 27, 1997, by James Sheridan. In condition number 13, "SPECIAL LIMITATIONS," the parole agent did not place "XX" next to "Mental Health" in the list of programs the petitioner agreed to complete, but the parole agent did check "Other" and included the following:

> Maintain contact with your parole agent at agent's discretion. Begin and maintain psychological or psychiatric treatment at a facility or with a psychologist or psychiatrist approved by the Board. Obtain Mental Health counseling. Verification of residence before release. This subject has done enough time for Burglary. He needs to get into Yankton or some other placement for mentally ill persons.

On July 10, 1997, the South Dakota Board of Pardons and Paroles released the petitioner from prison on parole and transferred him to the Human Services Center. A note attached to petitioner's medical records from the Human Services Center states in part: "7/8/97—Mr. Closs is currently under parole supervision. One of the conditions of his parole was that he voluntarily admit himself to the Human Services Center for treatment and care." On July 10, 1997, petitioner signed an Application For Hospitalization Voluntary Patient (Adult)—Psychiatric Services—," and he was admitted as a voluntary patient. The following day, July 11, 1997, petitioner signed a different parole Agreement, prepared and signed by a different supervising parole agent. The two parole Agreement forms were identical except for condition number 13, "SPECIAL LIMITATIONS." The second parole agent did check the line next to "Mental Health" and added "(HUMAN SERVICES CENTER)." Also, he amended the last paragraph to read:

> 1. MAINTAIN CONTACT WITH AGENT AS DIRECTED. 2. BEGIN AND MAINTAIN PSYCHLOGICAL (sic) OR PSYCHIATRIC TREATMENT AT A FACILITY OR WITH A PSYCHOLOGIST OR PSYCHIATRIST APPROVED BY THE BOARD. 3. SUPERVISION FEE OF $10.00 PER MONTH.

The petitioner's medical records from the Human Services Center show that, on

July 8, 1997, staff members at the mental health unit of the Penitentiary contacted the Human Services Center to arrange the petitioner's placement at the facility on July 10 as a voluntarily admitted patient. The notes show that petitioner was refusing all medications at the penitentiary, but that "he has been doing fairly well even while he has been off his meds." The notes show that Dr. Pesce recommended referral of the petitioner to the Human Services Center "for evaluation and possible treatment."

At the Human Services Center, Dr. Hartley Alsgaard, treating psychiatrist, conducted a psychiatric evaluation on July 10, 1997. He stated in his report:

*REASON FOR HOSPITALIZATION:* The penitentiary was faced with a situation where they had this patient refusing to take medication. They declared he did not meet the criteria for forced medication and they felt he was not sufficiently stable to return to the community. They then obtained a parole order saying that he had to come here and accept treatment or it would be a violation of his parole. They then transferred him here as a treatment prior to being returned to the community. One hopes that their intent was that when faced with the prospect of going back to the penitentiary he would agree to accept medication.

Dr. Alsgaard reported that petitioner "is not actually having a present illness at this time. He's off his meds for a couple of months now and evidently has not decompensated." Dr. Alsgaard also noted that petitioner was in no acute distress, and "he's very reluctant to acknowledge that he will accept medications. He stares for extended periods of time. Shows no other psychomotor abnormalities." The psychiatrist observed that petitioner's mood was neutral with some anxiety and his affect was blunted. He was coherent, but illogical, and frequently changed the topic of conversation. He demonstrated circular reasoning and did not "want to talk about medications. Is constantly trying to bargain, saying that we'll talk it out and will

be able to work it out but the bottom line is that he doesn't want to take the medications and he makes that quite clear." Petitioner denied audio and visual hallucinations and denied suicidal or homicidal ideas. No delusional material could be elicited from him. Dr. Alsgaard noted petitioner's cognitive function was dull normal to borderline intellectual functioning. He was oriented to time, place and person, but in Dr. Alsgaard's opinion, he had no insight and marginal judgment. Dr. Alsgaard prescribed Risperdal, a psychotropic medication, to be increased in dosage over a course of days.

Dr. Alsgaard wrote in a Psychiatric Progress Note dated July 11:

They sent him here as a Voluntary patient, as a condition of his parole. Further conditions of his parole include that if he does not cooperate with treatment, if he refuses medications, he is to be returned to the penitentiary as that will be a violation of his parole. Once he fully understood that we were aware of this situation and that was the situation, and it was explained to him clearly and unambiguously, he then agreed to take medication. He, in the past, has been pretty sneaky about slipping his medications and so we are going to great lengths to ensure that he does not have the opportunity to slip them.

The nursing assessment in petitioner's medical records from the Human Services Center shows that petitioner received his last injection of Haldol Decanoate at the Penitentiary in December 1996, when he refused further injections. He continued taking oral Haldol and Cogentin until the latter part of January 1997, when he refused those medications also. The nursing assessment stated that "according to Dr. Pesci (sic) and Dr. Morgan's notations, Randy has shown very few signs of deteriation (sic) since discontinuation of his medications." The assessment went on to say that petitioner "has now been paroled; contingent that he voluntarily admit himself to the HSC facility." Petitioner reported that

he suffers from a thick tongue and tight or stiff throat muscles when taking medications. The nursing assessment stated petitioner's "motivation is being out of the Penitentiary ... yet does not show any motivation to take an increase in medications as ordered by his psychiatrist." An entry in the medical records states that, on the afternoon of July 11, petitioner reported he had been locked up since 1982 "but feels really good about getting out into Sioux Falls."

Petitioner was initially cooperative in taking the medication prescribed by Dr. Alsgaard, but he quickly became noncompliant because he reported he had too many side effects. He refused an increase in medication on July 13 and refused all medications the evening of July 14 and the morning of July 15. Petitioner stated he would rather be back in prison than take the prescribed medications.

The Human Services Center notified the parole agent that petitioner was not taking medication and, on July 15, Dr. Somepalli ordered petitioner discharged to his parole agent. In his Discharge Summary, Dr. Somepalli reported:

> the penitentiary wanted him back due to parole violation which is refusing to cooperate with treatment. Patient's mental status remained unchanged during the stay in hospital. Patient showed tangential thinking. He denied auditory or visual hallucinations. He denied suicidal or homicidal ideations. No delusional thinking elicited at the time of psychiatric evaluation. He was free of agitation or threatening behavior.

A Human Services Center social worker reported in an Aftercare Plan that petitioner had limited involvement in his discharge and aftercare planning. Petitioner is estranged from his family, and he directed the social worker to make no contact with them. The parole agent placed petitioner at the Yankton County Jail until July 17, when petitioner was returned to the penitentiary's mental health unit.

The parole agent filed a parole violation report on July 15, claiming that petitioner violated his parole by failing to comply with condition number 10: "I will comply with all instructions in matters affecting my supervision and cooperate by promptly and truthfully answering inquiries directed to me by a Parole Agent." The parole agent reported that petitioner violated the stated parole condition on the evening of July 14 and the morning of July 15:

> he repeatedly refused to take his medications as prescribed by his attending Psychiatrist. Mr. Closs had previously refused to take his medications on 07/10/97 when he was first admitted to the Human Services Center, but accepted them after he was informed that cooperation with treatment was a condition of his parole.
>
> This Agent personally met with Mr. Closs on 07/11/97 and repeatedly discussed the fact that cooperation with his treatment was imperative and that any future refusal to do so would in fact result in a violation. Mr. Closs indicated that he understood what was expected of him in regards to treatment and how it could affect his parole status.

On July 15, petitioner signed a form in which he was informed of his constitutional rights concerning the parole violation report and he signed another form waiving his right to a preliminary hearing on the parole violation report.

On July 21, 1997, the Board of Pardons and Paroles notified petitioner in writing that a parole revocation hearing based on the violation report would be held on July 24, 1997. The record reflects that petitioner appeared for a parole revocation hearing on July 24. It is not possible to tell from the transcript of that hearing how many members of the Board were present, as only Chairman Eng and petitioner Closs spoke. Upon hearing a recitation of his rights, petitioner Closs first requested an attorney, then changed his mind and asked Chairman Eng to proceed rather than continue his case for one month to accomplish appointment of an attorney. (Parole Revocation Hearing Tr. at 4–5.) Petitioner

Closs coherently told Chairman Eng that he stopped taking the medications because of their side effects, including drowsiness, stiff muscles, and dry mouth. (*Id.* at 8.) He stated that, when he refused to take the medications, he was told parole revocation would follow, and the "doctor wouldn't talk to me because he was gone that, that day on the 15th, the morning of the 15th." (*Id.* at 9.) Petitioner denied that he violated parole. He told Chairman Eng, "there wasn't any agreement of me taking medications on, on the parole agreement. I did not violate parole." (*Id.*) He also told Chairman Eng that he had not been taking medication upon his return to the penitentiary: "The doctor here in Sioux Falls at, at the Jamison building thinks that I don't really need medication." (*Id.* at 10–11.) Petitioner Closs asked if he was going to be sent back to the Human Services Center and suggested: "You could change the plans a little bit and have me go out to the Glory House in, in Sioux Falls." (*Id.* at 11.) Chairman Eng told petitioner. "We will consider that and we will let you know on Monday." (*Id.*)

The written document filed by Chairman Eng on July 25, 1997, after the hearing on July 24, indicates that he recommended revocation of petitioner's parole under SDCL Chapter 24–15A, a statutory scheme which took effect in 1996 and expressly does not apply to petitioner, who was sentenced to prison for crimes committed prior to July 1, 1996. SDCL § 24–15A–1 (1998). Petitioner is an "old-system" inmate, and the parole statutes applicable to him are found in SDCL Chapters 24–13 and 24–15. Particularly, SDCL § 24–13–4.2 permits the chairman of the Board of Pardons and Paroles to designate an individual parole board member as a hearing officer to conduct hearings, hear applications, take testimony, and make recommendations to the board regarding the grant, denial, revocation, rescission or administrative continuance of parole. It is not clear from the transcript whether Chairman Eng sat alone as a hearing officer or whether other Board members were present. The statute requires reduction of any recommendation to writing, and review by the Board or a panel of the Board, who may adopt, modify, or reject the recommendation. SDCL § 24–13–4.5 provides that a person's parole may not be revoked without the concurrence of two Board members. Chairman Eng recommended revocation of parole and loss of two years good conduct credit. The Findings of Fact And Conclusion of Law were also signed by Chairman Eng on July 25 and state that the matter came before the Board of Pardons and Paroles on July 24, "the members of the Board being present, including Glen W. Eng, Chairman, and the alleged violator Randy L. Closs[.]" Chairman Eng also entered an Order Revoking Parole on July 25, 1997, and revoked two years of good conduct credit. Because Chairman Eng reported "the members of the Board being present" at the parole revocation hearing, it may be that SDCL § 24–13–4.5, which requires concurrence of two Board members to revoke parole, may have been followed, but the Court is not entirely convinced the statute was followed on the record as it exists.

On July 29, August 1, and August 4, petitioner sent written "kites" within the prison requesting appeal forms so that he could file an appeal in state court after his parole revocation hearing. On August 5, 1997, Jon E. Tveidt, Parole Department, responded in writing to petitioner that "there is no appeal to parole decisions." In an October 15, 1999 Order, this Court held that petitioner did not procedurally default his due process claim by failing to take an appeal to state circuit court from the parole revocation decision because a prison administrator played a direct role in causing the procedural default. Respondent continues to assert procedural default, contending that "the state official involved was not acting as a legal advisor to the Petitioner; that the appeal remedy clearly exists under South Dakota [law], SDCL ch. 1–26; and that this Respondent is not a guarantor for the correctness of all statements of law that might be made by various employees or agents of the Parole

Board." (Doc. 19, Respondent's Brief at 18.)

While the state courts do hear appeals from decisions of the Parole Board to revoke parole, *see e.g., Anderson v. South Dakota Board of Pardons and Paroles,* 590 N.W.2d 915 (S.D.1999), a federal habeas petitioner may show cause to excuse a procedural default if he can show that some objective factor external to the defense prevented him from presenting or developing the legal or factual basis of his claim. *Ruff v. Armontrout,* 77 F.3d 265, 267 (8th Cir.1996). This Court determined in its October 15 Order that prison officials told petitioner he could not take an appeal from the Board's decision to revoke his parole, and that is an "objective matter external to the defense" that prevented the petitioner from presenting the legal or factual basis of his claim to the South Dakota courts. Thus, the Court determines that petitioner has shown cause for any default, and surely he was prejudiced because his claims were not timely reviewed by the state courts on appeal from the parole revocation. While respondent may believe that he is "not a guarantor for the correctness of all statements of law that might be made by various employees or agents of the Parole Board," parole and prison officials should make every effort to give inmates factually correct information, particularly where the inmates' legal rights are at stake. The Court will not penalize a *pro se,* mentally ill inmate who has been in prison for fifteen years by enforcing a procedural default to avoid hearing his claims where the State itself had a hand in causing the procedural default to occur.

On November 19, 1997, petitioner signed a *pro se* state habeas petition claiming illegal detention based on the Board's Order Revoking Parole because "his liberty interest, having been given to him, was taken in violation of due process and in violation of fundamental fairness." Petitioner alleged that he did not violate parole because he voluntarily admitted himself to the Human Services Center as required and went there "with the fervent desire to do exactly what was required of him." Soon after arriving, the medical staff stated they wanted him to take medications, and petitioner began taking the medications prescribed. Petitioner wrote: "The records will show that these medications had extremely adverse effects on the Applicant." Petitioner stated he began suffering from extreme drowsiness and fatigue, dry mouth, and stiff muscles. He further stated: "According to the Parole Revocation records, Applicant quit taking the medications. If that was so, Applicant was acting under the extremely negative effects of the medication the medical staff forced upon him. Applicant is not too sure of events while he was under the forced use of the medications at the Human Services Center." Petitioner stated that, "[b]efore arriving at the Human Services Center, Applicant was not taking any medication and was functioning and understanding very well. When Applicant was taken out of the Human Services Center when his parole was revoked, he was taken off the medications and again began doing very well." Petitioner asserted that he did not willfully refuse to cooperate with the wishes of the Board of Pardons and Paroles, and "any failure to cooperate was strictly the result of Applicant's reactions to forced medication that had negative effects upon him and left him more asleep than awake."

The state habeas court appointed counsel on November 24, 1997. Ten months later, on September 24, 1998, counsel moved to withdraw under *Sweeney v. Leapley,* 487 N.W.2d 617 (S.D.1992) (adopting procedures of *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967)), on the ground that petitioner's due process claim was meritless. At a very brief hearing held on December 7, 1998, counsel told the court that petitioner had sent him a letter agreeing to the motion to withdraw. The court told petitioner, "It's up to you. I'll let you appeal it." Petitioner responded with, "No. I withdraw." and "My lawyer knows best." The court entered an Order that in one

sentence granted the motion to withdraw and dismissed the habeas petition as meritless after the court's independent review under *Sweeney*. The court granted a certificate of probable cause for appeal and appointed new counsel for the appeal. Appellate counsel briefed the issues of whether a revocation of parole conditioned on a voluntary commitment to a mental hospital is a violation of due process and whether a denial of parole based on transfer to a mental hospital, which is conditioned on mandatory behavior modification treatment, is a change in the conditions of confinement that should not have been imposed on this inmate without the opportunity for notice and an adequate hearing. The South Dakota Supreme Court summarily affirmed without opinion in an Order entered June 7, 1998.

Petitioner now argues in this federal habeas proceeding, through appointed counsel, that the revocation of his parole for failure to take medications while in a mental institution was a violation of his due process rights. Petitioner cites state statutes which give mental patients the right to refuse medication, and points out that state statutes providing for court-ordered use of psychotropic medication were not invoked in his case. He also argues that state statutory provisions for emergency detention or involuntary commitments were not utilized. Petitioner recognizes that case law in the context of parole revocation because of mental health status is limited, but he discusses the principles of such cases as *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980), *Wash-*

*ington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), and *Foucha v. Louisiana,* 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992).

Respondent agrees that petitioner exhausted his state remedies, but resists the petition, arguing that petitioner has no right to parole and he admitted himself to the Human Services Center voluntarily as part of his parole agreement. Further, respondent argues that the Board of Pardons and Paroles may place reasonable restrictions on parole, and petitioner violated his parole by refusing psychiatric treatment.

In response to the Court's request for information about petitioner's current status within the state corrections system, respondent informed the Court that petitioner remains a penitentiary inmate at this time, housed at the Jamison Annex, South Dakota State Penitentiary. As of late October, petitioner was in Disciplinary Segregation following an incident in which he threw an unknown substance at a staff member. Petitioner is required to take psychotropic medications in accordance with Operations Memorandum #4–6, which apparently was drafted to satisfy the procedural requirements of *Washington v. Harper* and SDCL §§ 24–2–32 to 24–2–36, which took effect in 1996, before the parole and parole revocation at issue here.[2] Medications are offered to petitioner orally, and when he refuses, which is frequently, injections are administered. The Court notes that the Operations Memorandum #4–6 provided by respondent has an effective date of December 11, 1998, after the events at issue in this habeas petition.

2. SDCL 24–2–33 provides:

**Hearing required prior to treatment with psychotropic medication.** Prior to involuntary treatment with psychotropic medication, the inmate shall receive a hearing before a panel consisting of a psychiatrist, a physician, and a representative of the warden, none of whom may have participated in the inmate's current diagnosis, evaluation, or treatment. The inmate has the right to notice of the hearing, the right to attend the hearing, and the right to present evi-

dence and cross-examine witnesses, and the right to representation by a disinterested lay advisor knowledgeable about psychological issues. The panel may order involuntary treatment with psychotropic medication by majority vote of the panel if the psychiatrist is in the majority. The inmate may appeal the decision of the panel to the secretary of corrections. The inmate may appeal the decision of the secretary to circuit court pursuant to chapter 1–26.

While respondent did not provide information to confirm that the procedures of Operations Memorandum #4–6 were utilized before requiring petitioner to submit to forced medication in prison, that issue is not before the Court in this federal habeas petition.[3] The Court observes that, other than the statement that petitioner becomes verbally aggressive and throws things if he is not medicated, the record before the Court contains no evidence that in July 1997 petitioner had been determined by any person or entity to be a danger to himself or others.

With no further loss of good time, petitioner's good time release date is November 25, 2001. This date was determined after deduction of good time for parole revocation and prison misconduct. Petitioner's sentence expiration date is January 28, 2002, if further good time is deducted for misconduct, and petitioner is next scheduled for parole consideration at the regular meeting of the Board of Pardons and Paroles in March 2000.

## II. Discussion

Respondent asserts that this Court's standard of review in this § 2254 habeas case is circumscribed by 28 U.S.C. § 2254(d), which mandates deferential review of state court decisions. The statute provides in (d)(1) that this Court shall not grant habeas relief on a claim that was adjudicated on the merits in state court unless it "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Under Eighth Circuit law, an "unreasonable application" is one that, " 'evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent.' " *Long v. Humphrey,*

184 F.3d 758, 760 (8th Cir.1999) (adopting Third Circuit test); *Corder v. Rogerson,* 192 F.3d 1165, 1168 (8th Cir.1999); *Newman v. Hopkins,* 192 F.3d 1132, 1136 (8th Cir.1999); *Richardson v. Bowersox,* 188 F.3d 973, 977–78 (8th Cir.1999); *James v. Bowersox,* 187 F.3d 866, 869 (8th Cir. 1999).[4] The statute provides in (d)(2) that the Court shall not grant habeas relief on a claim that was adjudicated on the merits in state court unless the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Section 2254(e)(1) requires the Court to presume correct any factual determination made by a state court, and the habeas petitioner has the burden to rebut the presumption of correctness by clear and convincing evidence. Section 2254(e)(2) places limitations on this Court's authority to hold an evidentiary hearing where the petitioner failed to develop the factual basis of his claim in a state court proceeding.

The record was not developed in state court because petitioner's state habeas counsel moved to withdraw and filed an *Anders* brief under *Sweeney,* 487 N.W.2d 617. The brief filed by state habeas counsel, however, read almost like a brief for the State and it did not comply with *Anders* and *Penson v. Ohio,* 488 U.S. 75, 109 S.Ct. 346, 102 L.Ed.2d 300 (1988). *See Evans v. Clarke,* 868 F.2d 267, 268–69 (8th Cir.1989). Petitioner's counsel focused solely upon cases granting parole authorities power to place reasonable conditions on a grant of parole and argued that the conditions imposed upon petitioner were reasonable. On appeal from the denial of state habeas, newly appointed counsel for petitioner raised Fourteenth Amendment issues that counsel below missed, but the

3. Any claim as to forced medication in prison must be brought as a constitutional claim challenging the conditions of confinement under 42 U.S.C. § 1983.

4. On April 5, 1999, the Supreme Court granted a writ of certiorari to resolve the conflict among the circuits as to the proper interpretation of section 2254(d)(1). *Williams v. Taylor.* —— U.S. ——, 119 S.Ct. 1355, 143 L.Ed.2d 516 (1999). Until the Supreme Court rules in *Williams,* this Court is bound by applicable Eighth Circuit precedent.

South Dakota Supreme Court summarily affirmed without opinion, and it is not possible to tell whether that court considered the Fourteenth Amendment issues raised. Because this Court concluded on its initial review of the habeas petition that an arguable due process claim is presented, the Court appointed for petitioner the same attorney who represented petitioner on appeal to the South Dakota Supreme Court and requested full briefing from the parties. The Court also relied upon the authority of Rule 7 of the Rules Governing Section 2254 Cases to expand the documentary record so that the issues may be more clearly defined. In his brief in opposition to the habeas petition, respondent now states that he "waives any objection to consideration of materials requested in the Court's Order of November 18, 1999, even though such materials were not presented to, nor considered by, the South Dakota Circuit and Supreme Courts. Respondent requests that this Court consider such materials as part of an expanded record." (Doc. 19, Brief at 1.) Because there was not an evidentiary hearing held during the state habeas proceeding, there are no state court factual findings deserving of the presumption of correctness under § 2254(e)(1). This Court does not find a need or a basis for a federal evidentiary hearing, so the requirements of § 2254(e)(2) are not at issue in this case. Moreover, because there was not a fact finding hearing in state court, this Court need not consider whether the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding[]" under § 2254(d)(2).

To determine whether the South Dakota state courts' decision to deny habeas relief "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[,]" § 2254(d)(1), the Court must first identify the controlling case law. *See Long,* 184 F.3d at 759. In *Vitek v. Jones,* 445 U.S. 480, 482–83, 100 S.Ct. 1254, 1258, 63 L.Ed.2d 552 (1980), the Su-

preme Court considered "whether the Due Process Clause of the Fourteenth Amendment entitles a prisoner convicted and incarcerated in the State of Nebraska to certain procedural protections, including notice, an adversary hearing, and provision of counsel, before he is transferred involuntarily to a state mental hospital for treatment of a mental disease or defect." After determining that the case was not moot because of the prisoner's parole on the condition that he accept psychiatric treatment at a Veterans' Administration Hospital and then his subsequent parole revocation, the court affirmed on the merits the decision of the three-judge district court panel that the involuntary transfer of a prisoner to a mental hospital implicates a liberty interest found in and protected by the Due Process Clause of the Fourteenth Amendment and Nebraska statute. *Id.* at 488–94, 100 S.Ct. at 1261–64. The Supreme Court approved use of procedures similar to those approved in *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), including written notice, a hearing, an opportunity to present witnesses and to confront and cross-examine witnesses called by the state, an independent decision maker, a written statement by the factfinder of the evidence relied on and the reason for transferring the inmate, and effective and timely notice of all rights. *Id.* at 494–95, 100 S.Ct. at 1264–65. A plurality of the court agreed that indigent prisoners should be entitled to counsel. *Id.* at 496–97, 100 S.Ct. at 1265–66. *See also Lappe v. Loeffelholz,* 815 F.2d 1173 (8th Cir.1987).

Ten years later, in *Washington v. Harper,* 494 U.S. at 212, 110 S.Ct. at 1032, the Supreme Court considered "whether a judicial hearing is required before the State may treat a mentally ill prisoner with antipsychotic drugs against his will." Harper, a Washington inmate, was housed in the prison's mental health unit for four years, where he consented to the administration of antipsychotic drugs. He was paroled in 1980 on the condition that he participate in psychiatric treatment, and while on parole, he continued to receive treatment, at one point pursuant to a civil commitment or-

der. In December 1981, the State revoked Harper's parole after he assaulted two nurses at a hospital. Upon his return to prison, he was sent to the Special Offender Center, a state correctional institute established to diagnose and treat convicted felons with serious mental disorders. At first, Harper voluntarily consented to administration of antipsychotic drugs, but by November 1982 he refused to continue taking the prescribed medications. Harper's treating physician then sought to medicate him involuntarily pursuant to a policy Washington had adopted following the Supreme Court's *Vitek* decision, and over the next three years Harper was at times involuntarily medicated. *Harper*, 494 U.S. at 214–17, 110 S.Ct. at 1032–34.

In early 1985, Harper brought suit in state court under 42 U.S.C. § 1983 claiming the state's failure to provide a judicial hearing before the involuntary administration of antipsychotic drugs violated the Due Process, Equal Protection, and Free Speech Clauses of both the federal and state constitutions and state tort law. *Harper*, 494 U.S. at 217, 110 S.Ct. at 1034. Following a bench trial, the district court held that Harper had a liberty interest in not being subjected to involuntary medication and that the procedures in Washington's policy met the requirements of due process as stated in *Vitek*. *Id.* at 217–18, 110 S.Ct. at 1034. The Washington Supreme Court reversed, agreeing that Harper possessed a liberty interest, but ruling that the state could involuntarily medicate a prisoner only after a judicial hearing,

with the full panoply of adversarial procedural protections, in which the state proved by clear and convincing evidence that the administration of antipsychotic medication was both necessary and effective for furthering a compelling state interest. *Id.* at 218, 110 S.Ct. at 1034–35.

The Supreme Court recognized, as does this Court, the competing interests at stake: the considerable debate over the potentially serious, even fatal, side effects of antipsychotic medications and the "substantial interference" with a person's liberty caused by the undesired administration of such drugs, and the psychiatric profession's identification of the proper use of such drugs as one of the most effective means of treating and controlling mental illness likely to lead to violent behavior. *Id.* at 226, 239, 110 S.Ct. at 1039, 1041. Analytically, the Supreme Court framed two issues: "the substantive issue is what factual circumstances must exist before the State may administer antipsychotic drugs to the prisoner against his will; the procedural issue is whether the State's nonjudicial mechanisms used to determine the facts in a particular case are sufficient." *Id.* at 220, 110 S.Ct. at 1036. The court held that the Washington policy itself, crafted following *Vitek*, and permitting a psychiatrist to treat an inmate with antipsychotic drugs against his wishes only if he is found to be mentally ill and gravely disabled or dangerous, created a justifiable expectation on the inmate's part that the drugs would not be administered unless those conditions existed.[5] *Id.* at 221, 110 S.Ct. at 1036. The

5. Similarly, South Dakota State Penitentiary Operations Memorandum #4–6, effective December 11, 1998, requires that, before an inmate may be involuntarily medicated with psychotropic drugs, three criteria must be met: "1. The presence of a severe mental illness. 2. Evidence of a danger to self or others. 3. A refusal to comply and/or a history of sporadic or partial compliance with the prescribed medication regime despite staff efforts to encourage compliance." Assuming South Dakota had adopted this policy after *Vitek* and *Harper* and that it was in effect in 1997, there is no evidence in this record that, at the time the Board of Pardons and Paroles granted petitioner parole in June 1997, peti-

tioner presented a danger to himself or others in the penitentiary. Rather, Dr. Pesce, the treating physician, described petitioner as "quite fragile" and "not well-equipped to succeed in society" without support. The medical records of the Human Services Center confirm that, in early July 1997, petitioner had not taken psychotropic medication for several months, his mental condition had not deteriorated, he was not experiencing an active episode of his mental illness, and he was not a danger to himself or others while admitted as a voluntary patient at the Human Services Center. Dr. Alsgaard included in his report a statement that penitentiary officials "declared [petitioner] did not meet the criteria for

Supreme Court said also: "We have no doubt that, in addition to the liberty interest created by the State's Policy, [a prisoner] possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Id.* at 221–22, 110 S.Ct. at 1036. However, the court held "that the Due Process Clause confers upon [the prisoner] no greater right than that recognized under state law[,]" *id.* at 222, 110 S.Ct. at 1037, and the court declined to impose the requirement of a full judicial hearing before antipsychotic medications may be administered involuntarily to an inmate. *Id.* at 228, 110 S.Ct. at 1040. "[G]iven the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Id.* at 226, 110 S.Ct. at 1040. *See also Walton v. Norris,* 59 F.3d 67, 68 (8th Cir.1995); *Gay v. Turner,* 994 F.2d 425, 427 (8th Cir.1993).

In a concurring opinion, Justice Blackmun was concerned that not all prison authorities allow forced medication because it is in the inmate's medical interest, but rather, because forced medication is in the State's best interest because it makes the inmate easier to handle. Justice Blackmun observed that, "although the Court does not find, as Harper urges, an absolute liberty interest of a competent person to refuse psychotropic drugs, it does recognize that the substantive protections of the Due Process Clause limit the forced administration of psychotropic drugs to all but those inmates whose medical interests would be advanced by such treatment." *Id.* at 243, 110 S.Ct. at 1048. Justice Blackmun flatly remarked that "[f]orced administration of antipsychotic medication may not be used as a form of punishment." *Id.* at 241, 110 S.Ct. at 1047.

In *Riggins v. Nevada,* 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992), the Supreme Court held that forced administration of antipsychotic medication to a defendant during his criminal trial violated his Sixth and Fourteenth Amendment rights and reversed the conviction. While the case in not on point here, it is important for its repeated theme that "[u]nder *Harper,* forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness." *Id.* at 135, 112 S.Ct. at 1815. The court reversed because the Nevada trial court "did not acknowledge the defendant's liberty interest in freedom from unwanted antipsychotic drugs." *Id.* at 137, 112 S.Ct. at 1816.

Petitioner's counsel cites to this Court two additional Supreme Court cases: *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (holding that Fourteenth Amendment requires use of clear and convincing evidence standard in civil commitment proceeding) and *Foucha v. Louisiana,* 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) (holding that state statute allowing continued confinement of insanity acquittee after hospital review committee reported no evidence of mental illness and recommended conditional discharge violates Due Process Clause). While these cases are also not on point, they are important for their statements of strong protection for the due process rights of individuals with mental illness, particularly those charged with committing crimes.

*Vitek, Harper, Riggins, Addington,* and *Foucha* constitute the applicable "clearly established Federal law, as determined by the Supreme Court of the United States[,]" that this Court is required to consider under § 2254(d)(1). *See Long,* 184 F.3d at 759. Applying § 2254(d)(1), the state court decisions in this case were

---

forced medication[.]" The Court concludes that Operations Memorandum #4–6 conferred upon petitioner a liberty interest in

remaining free of forced medication unless the policy's criteria were met. *Harper,* 494 U.S. at 221, 110 S.Ct. at 1036.

"contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," because the lower state court failed to consider Supreme Court law on this subject at all, and the South Dakota Supreme Court did not provide any reasoning to justify its decision to reject petitioner's appeal. Evaluated objectively and on the merits, *see Long,* 184 F.3d at 760, the state court decisions, which did not even address petitioner's Fourteenth Amendment liberty interest in refusing antipsychotic medication, cannot be reasonably justified under existing Supreme Court precedent. Further analysis of the interplay between the Board's right to place reasonable restrictions on parole and the inmate's right to refuse antipsychotic medication convinces the Court that the habeas writ must be granted.

■ Petitioner did not have a constitutional or inherent right to parole, *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979), and the South Dakota parole statute, SDCL § 24–15–1.1, does not create a liberty interest in parole protected by the Due Process Clause. *Dace v. Mickelson,* 816 F.2d 1277, 1281 (8th Cir.1987). But once the State granted petitioner conditional liberty in June 1997, due process protections attached to the decision to revoke parole the following month. *See Morrissey,* 408 U.S. at 484, 92 S.Ct. at 2602. Additionally, petitioner's state-created right to good time credit, SDCL § 24–5–1, which "is absolute and cannot be granted or taken away arbitrarily[,]" *Lewis v. Class,* 565 N.W.2d 61, 64 (S.D.1997), constituted a liberty interest protected by the Due Process Clause. *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Lewis,* 565 N.W.2d at 64.

The purpose of parole "is to help individuals reintegrate into society as constructive individuals as soon as they are able, without being confined for the full term of the sentence imposed. It also serves to alleviate the costs to society of keeping an individual in prison." *Morrissey,* 408 U.S.

at 477, 92 S.Ct. at 2598. In return for parole, inmates agree to abide by specified conditions for the duration of their terms, and these conditions "restrict their activities substantially beyond the ordinary restrictions imposed by law on an individual citizen." *Id.* at 478, 92 S.Ct. at 2598. "The parole officers are part of the administrative system designed to assist parolees and to offer them guidance." *Id.* at 478, 92 S.Ct. at 2599. Parole officers possess enforcement leverage to support the parole conditions through authority to return the parolee to prison to serve the balance of his term if he fails to abide by the rules of parole. *Id.* However, "[i]n practice, not every violation of parole conditions automatically leads to revocation. Typically, a parolee will be counseled to abide by the conditions of parole, and the parole officer ordinarily does not take steps to have parole revoked unless he thinks that the violations are serious and continuing so as to indicate that the parolee is not adjusting properly and cannot be counted on to avoid antisocial activity." *Id.* at 478–79, 92 S.Ct. at 2599 (footnote omitted). The Supreme Court has said:

> Implicit in the system's concern with parole violations is the notion that the parolee is entitled to retain his liberty as long as he substantially abides by the conditions of his parole. The first step in a revocation decision thus involves a wholly retrospective factual question: whether the parolee has in fact acted in violation of one or more conditions of his parole. Only if it is determined that the parolee did violate the conditions does the second question arise: should the parolee be recommitted to prison or should other steps be taken to protect society and improve chances of rehabilitation?

*Id.* at 479–80, 92 S.Ct. at 2599.

In *Felce v. Fiedler,* 974 F.2d 1484, 1488 (7th Cir.1992), the Seventh Circuit held that a Wisconsin inmate could claim a liberty interest in mandatory release parole under state law without unwanted adminis-

tration of antipsychotic drugs, as well as a liberty interest in refusing antipsychotic medication stemming directly from the Due Process Clause of the Fourteenth Amendment, as stated in *Harper. Id.* at 1489, 1491. The appeals court noted, however, that there was an unexplainable void in state law with regard to imposing antipsychotic medication on parolees and "the absence of state law and regulation with respect to parole makes it impossible for us to agree with Mr. Felce that Wisconsin has given mandatory parolees a liberty interest in avoiding antipsychotic drug therapy." *Id.* at 1493–94. Absent action by the state, the Seventh Circuit rested its decision only on the Due Process Clause, as recognized by the Supreme Court in *Harper* and *Riggins.*

Similarly to respondent here, Wisconsin authorities argued that the set of conditions they could place on a parolee is a different set from, rather than a subset of, the conditions it can place on a prisoner. *Id.* at 1494. Wisconsin argued that the liberty interest against forced administration of antipsychotic drugs in prison does not overlap the liberty interest in mandatory release parole because, unlike a prisoner forced to take the drug, a parolee can choose to avoid the drugs by foregoing parole and serving the remainder of his sentence in prison. *Id.* In response to this argument, the Seventh Circuit concluded that it could apply, in the parole context, the Supreme Court case of *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987) (holding that prison regulation impinging on inmate's constitutional rights is valid it if is reasonably related to legitimate penological interests), just as the Supreme Court had applied *Turner* in *Harper. Id.* The court held the *Turner* considerations can justify the use of antipsychotic drugs during parole, since parole is an extension of the prison walls. The court noted:

> In the parole setting, the state arguably loses a significant number of the alternate methods it has at its disposal in the prison setting to deal with the prisoner's illness and the resultant behavior. This

factor may, in the judgment of competent medical authority, increase the necessity of resort to these medications in some situations. On the other hand, the state's responsibility to the parolee includes the obligation to prepare him for even more complete reintegration into society. This factor again must be weighed with the advice of competent medical authority in determining the appropriateness of continued medication.

*Id.* at 1495. The Seventh Circuit ultimately concluded that the inmate "had a right to parole subject to conditions that both achieved the state's legitimate goals for the parole period and conformed to constitutional standards[,]" that "the liberty interest against involuntary use of antipsychotic drugs guaranteed by the Due Process Clause for parolees is essentially the same as that recognized for those incarcerated in an institutional setting[,]" and "[b]efore use of such drugs can be made a condition of [an inmate's] parole, the state must demonstrate that such administration is medically indicated to accomplish the goals of the parole program of reintegrating [the inmate] into the community." *Id.* at 1495–96. The Seventh Circuit then applied the factors of *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), using *Harper* as a guide, to determine what process is due the paroled inmate, taking into account the private interest affected by official action, the risk of erroneous deprivation of the interest through the procedures used and the probable value, if any, of additional or substituted procedural safeguards, and the state's interest. *Id.* at 1496–98.

■ The Seventh Circuit's review of the record indicated that Wisconsin had a substantial basis for concern that inmate Felce might engage in antisocial, and perhaps violent, behavior upon release, but there was other evidence that the state knew the inmate did not qualify for commitment and, under state law, the inmate did not meet the criteria for forced admin-

istration of antipsychotic medication. Moreover, inmate Felce did not manifest current symptoms of mental illness, and there was some indication his problems were not severe enough to require antipsychotic therapy. *Id.* at 1497–98. Based on this information in the record, the Seventh Circuit held that "the procedure followed by the defendants was insufficiently neutral and independent to guard against an erroneous determination that Mr. Felce was an appropriate subject for antipsychotic drug treatment. The parole plan, while devised with medical advice, was not subject to independent medical evaluation. Therefore, there was no safeguard against the imposition of a plan that was not justified medically.... At no time was this data subject to evaluation by a neutral decisionmaker." *Id.* at 1498. Additionally, the court said, "we are persuaded that the involvement of an independent decisionmaker would benefit significantly the protection of the liberty interest at stake without a significant burden upon either the resources of the state or the substantial interests that the state has in protecting the public and rehabilitating its parolees. Therefore, we conclude that ·the defendants' current procedure—with its heavy emphasis upon the judgment of the individual parole agent—is constitutionally inadequate." *Id.* at 1500.

When the Board of Pardons and Paroles granted parole to petitioner Closs, it required only that he "begin and maintain psychological or psychiatric treatment at a facility or with a psychologist or psychiatrist approved by the Board[.]" The Board did not expressly require in writing that petitioner agree to take psychotropic medication or face revocation of parole. The Board did not convene an independent panel under *Harper* to approve forced administration of antipsychotic medication while petitioner was on parole. In fact, petitioner had been doing quite well in prison without medication at the time of his parole, and Dr. Pesce's concern was that petitioner was too fragile to return to society without support. At the Human Services Center, Dr. Alsgaard noted that

penitentiary officials "declared [petitioner] did not meet the criteria for forced medication[.]" Neither of the two parole Agreements petitioner signed expressly required him to submit to psychotropic medication while on parole. Even the second Agreement dated July 10, 1997, which memorialized petitioner's placement at the Human Services Center, stated that petitioner was required to "BEGIN AND MAINTAIN PSYCHLOGICAL (sic) OR PSYCHIATRIC TREATMENT AT A FACILITY OR WITH A PSYCHOLOGIST OR PSYCHIATRIST APPROVED BY THE BOARD." While the phrase "psychiatric treatment" certainly includes the possibility of administration of psychotropic medications, South Dakota statutes written for the protection of mentally ill persons recognize there are many possible treatments that may be employed and that the mentally ill individual has a right to participate in the planning of services and treatments to be provided. SDCL § 27A–12–3.6.

■ Most importantly, SDCL § 27A–12–3.12 (emphasis added) provides that, unless emergency administration of psychotropic medication is necessary, "*any* adult person who is admitted as an inpatient ... has the right to refuse to be subjected to research and experimental or intrusive procedures. *The person also may refuse any treatment including electroconvulsive therapy and psychotropic medication.*" This petitioner, even though a parolee, had a liberty interest springing from state statute and the Fourteenth Amendment, which allowed him to refuse psychotropic medication, a right which he exercised by refusing to take such medication while held at the Human Services Center on parole. Dr. Alsgaard indicated in his psychiatric evaluation upon petitioner's admission to the Human Services Center that petitioner was not having a present mental illness and was opposed to taking psychotropic medication, but Dr. Alsgaard ordered it anyway. Petitioner's parole agent met with petitioner on July 11, 1997, after he refused medication and "repeatedly discussed the fact that cooperation with

his treatment was imperative and that any future refusal to do so would in fact result in a violation." This oral instruction of the parole agent to petitioner to continue taking psychotropic medication against his will did not comply with the procedural due process requirements of *Harper*, as extended to parolees in *Felce*, that are necessary to override the petitioner's substantive due process interest in refusing unwanted medication. Not until after petitioner's parole was revoked did authorities utilize the procedures of *Harper* to allow independent evaluation of petitioner's need for psychotropic medication while held in prison. *See Doby v. Hickerson*, 120 F.3d 111, 113 (8th Cir.1997) (upholding in § 1983 case district court's finding that *Harper* procedural protections were not provided to inmate at any time and such conduct violated clearly established law). Reliance on the judgment of the parole agent was not constitutionally adequate. *See Felce*, 974 F.2d at 1500.

Under *Morrissey*, it is questionable whether petitioner violated his parole conditions at all. He complied with placement at the Human Services Center and voluntarily admitted himself to that facility as requested. He began taking the psychotropic medication as directed by his treating psychiatrist and refused it only after experiencing unwanted side effects. Based on the parole agent's actions, which the Court has already said were not constitutionally adequate, the Board summarily revoked parole and punished petitioner for exercising his right to refuse psychotropic medication by revoking two years of good conduct credit and returning him to prison. The Board paid no attention to the state statute prohibiting any reprisal following the exercise of the right to refuse antipsychotic medication, including "reprisal through the actual or threatened denial of any treatment, benefits, privileges or other rights." SDCL § 27A–12–33.1. The Board did not even follow the applicable state statutes in revoking petitioner's parole.

Even if petitioner violated his parole by refusing medication at the Human Services Center and was properly returned to pris-

on, the Court still concludes under *Harper, Felce, Lewis,* and SDCL § 27A–12–33.1 that the Board could not revoke two years of petitioner's good conduct credit because he chose to exercise his statutory and constitutional right to refuse psychotropic medication, and the state did not employ the necessary procedures to establish justification for overriding petitioner's liberty interest. The Board could have returned petitioner to prison for the purposes of a revocation hearing and to invoke the *Harper* procedures to require medication, if petitioner met the criteria for forced administration of psychotropic medication. *See Cochran v. Dysart*, 965 F.2d 649, 651 (8th Cir.1992) (holding reasons given by doctor to force administration of antipsychotic medications on federal inmate did not satisfy *Harper*). Or the Board could have reinstated parole and sought an appropriate placement for petitioner other than the Human Services Center.

In light of the constitutionally inadequate procedures undertaken, the Court is compelled to grant the writ of habeas corpus to require respondent to reinstate the two years of good conduct credit taken from the petitioner without due process. Unless petitioner has suffered additional loss of good time credit because of misconduct in prison, it appears highly likely that, with the restoration of two years of good conduct credit, petitioner may be eligible for immediate release from prison. Accordingly,

IT IS ORDERED:

(1) that the petition for writ of habeas corpus is granted. (Doc. 1.)

(2) that the Court directs respondent to restore immediately to the petitioner two years of good conduct credit.

(3) that respondent will promptly consider whether petitioner is eligible for immediate release from prison in light of this Court's restoration of two years of good conduct credit to the petitioner.